Bob BRUEGGEMEYER, Plaintiff,

v.

AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.

Civ. A. Nos. CA3–83–1819–D, CA3–84–1756–D.

United States District Court, N.D. Texas, Dallas Division.

April 25, 1988.

# MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

This libel, slander, and false-light invasion of privacy action presents the questions whether plaintiff, Bob Brueggemeyer ("Brueggemeyer"), is a limited purpose public figure and, if so, whether he has produced sufficient summary judgment evidence to support a reasonable jury finding, based upon clear and convincing evidence, that defendants acted with actual malice when they allegedly defamed him during a broadcast of the network television program 20/20. The court grants summary judgment in favor of defendants because the court concludes that plaintiff is a limited purpose public figure and that a reasonable jury could not find actual malice by clear and convincing evidence.

## I.

Plaintiff, Brueggemeyer, has for a number of years been engaged in the bulk meat or freezer beef industry. By himself and with others, including Maurice Wolfe ("Wolfe"), both in corporate forms and/or under assumed names, Brueggemeyer has successfully sold beef in bulk (by the carcass, by the side, and by multiple cuts) to retail consumers located throughout the United States. Beginning no later than the middle 1970's, plaintiff's sales practices began to draw fire from local law enforcement authorities and at least one Better Business Bureau ("BBB"). By December 1979, *The Dallas Morning News* had published a front page article about Brueggemeyer entitled, "Inquiries spoiling meat baron's reputation."

Following receipt of a letter from the San Angelo, Texas BBB, defendant, American Broadcasting Companies, Inc. ("ABC"), assigned personnel to investigate the charges concerning Brueggemeyer's bulk meat sales. At the conclusion of its investigation, ABC broadcast on its 20/20 program a story entitled "Bum Steer."[1] Plaintiff contends the October 13, 1983

Joseph G. Chumlea and Mark S. McQuality of Phalen, Chumlea & McQuality, Dallas, Tex., for plaintiff, Bob Brueggemeyer.

Charles L. Babcock and Frank C. Vecella of Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendants, American Broadcasting Companies, Inc., Robert Lange, and John Stossel.

---

1. A transcript of the "Bum Steer" story is set forth as an appendix to this memorandum opinion and order.

broadcast contained 24 statements that defamed him and invaded his privacy right.[2] He filed this civil action against ABC, Robert Lange ("Lange"), the producer of the story, and John Stossel ("Stossel"), the consumer correspondent on the broadcast (collectively "defendants"). In a separate suit filed in 1984, which has been consolidated with the present case, Brueggemeyer sued Steve Krut ("Krut"), the Executive Director of the American Association of Meat Processors ("AAMP"), who was interviewed during the 20/20 program. The court has today granted Krut's separately filed summary judgment motion. *See Brueggemeyer v. Krut,* 684 F.Supp. 471 (N.D. Tex.1988).

## II.

Defendants move for summary judgment on four grounds.[3] The court need only decide, however, whether plaintiff is a limited purpose public figure and, if so, whether he has adduced sufficient summary judgment evidence from which a reasonable jury could find, by clear and convincing evidence, that defendants acted with actual malice in defaming[4] plaintiff.

## A.

*New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny teach that a public official or public figure suing for libel[5] must shoulder the heavy burden of showing that the defendants acted with "actual malice." *Id.* at 279–80, 84 S.Ct. 726. To act with "actual malice" means to act with knowledge that the publication was false or to act "with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 726. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed. 2d 789 (1974), the Court explained that reckless disregard means a "high degree of awareness of . . . probable falsity" (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); and *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). In *St. Amant* the Court held that reckless disregard is not measured by a reasonably prudent person standard but is instead assayed by determining whether the defendant "in fact entertained serious doubts as to the truth of his publication." *Id.,* 390 U.S. at 731, 88 S.Ct. at 1325. Actual malice cannot be shown only by demonstrating ill will, negligence, or even gross negligence on the defendant's part. *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1070 (5th Cir.1987) (citing *Garrison,* 379 U.S. at 79, 85 S.Ct. at 218; and *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 542, 17 L.Ed. 2d 456 (1967)). The inquiry focuses on the defendant's state of mind, *Herbert v. Lando,* 441 U.S. 153, 170, 99 S.Ct. 1635, 1645–46, 60 L.Ed.2d 115 (1979), which may be proven by indirect or circumstantial evidence. *Id.* at 165, 99 S.Ct. at 1643. Because First Amendment concerns are squarely implicated, the public

---

**2.** Of the 24 alleged defamatory statements, Brueggemeyer limits his summary judgment response to three statements discussed *infra.*

**3.** Defendants have previously moved to dismiss plaintiff's claims and for summary judgment on the grounds of collateral estoppel and that plaintiff is libel-proof. The court denied the motions in an August 29, 1986 memorandum opinion and order and directed that previously stayed discovery be undertaken. Following substantial discovery, defendants have reurged these grounds together with the grounds on which the court bases this decision.

**4.** For the purpose of deciding this motion on the grounds presented, the court assumes that defendants defamed Brueggemeyer. It is clear from the briefing, however, that defendants deny that they defamed plaintiff.

**5.** Plaintiff also alleges claims of slander and false-light invasion of privacy. There is no apparent basis in the record for a slander claim because the broadcasting of defamatory statements read from a script constitutes libel rather than slander. *Christy v. Stauffer Publications, Inc.,* 437 S.W.2d 814, 815 (Tex.1969). The constitutional protections that apply to defamatory publications likewise apply to false-light invasions of privacy. *Braun v. Flynt,* 726 F.2d 245, 249 (5th Cir.), *cert. denied sub nom. Chic Magazine, Inc. v. Braun,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984). Accordingly, where the court in this opinion discusses plaintiff's libel claim, the court intends to include plaintiff's false-light invasion of privacy claim as well.

figure plaintiff must prove actual malice with convincing clarity. *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 729.

In a libel case the usual summary judgment standards apply, together with the additional requirement that a public figure plaintiff comply with the "clear and convincing" burden of proof. *Zerangue,* 814 F.2d at 1071 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). If the non-movant demonstrates any genuine issue of material fact, the court must deny the summary judgment motion. In deciding the motion, the court is required to draw all inferences in favor of the non-movant. Fed.R.Civ.P. 56(c); *Zerangue,* 814 F.2d at 1071. The moving party must demonstrate the absence of genuine issues, but as to issues on which his opponent bears the burden of proof, the movant may obtain summary judgment by pointing to his opponent's failure to produce such evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986). Regarding the necessity to adduce clear and convincing evidence, *Anderson* instructs the district court to inquire "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." 106 S.Ct. at 2514. Where a factual dispute concerns actual malice, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.*

### B.

To invoke the more burdensome "actual malice" standard, of course, defendants must demonstrate that Brueggemeyer is a public figure. The cases are familiar, beginning with *Gertz,* that there are two classes of public figures. There are those who achieve such pervasive fame or notoriety that they become a public figure for all

purposes and in all contexts. *Id.,* 418 U.S. at 351, 94 S.Ct. at 3012–13. There is also a more limited genre of public figure, a limited purpose public figure, who achieves such status by thrusting himself to the forefront of a particular controversy in order to influence the resolution of the issues involved or because he voluntarily injects himself or is drawn into a particular public controversy. *Id.* at 345, 351, 94 S.Ct. at 3012–13. *See also Braun v. Flynt,* 726 F.2d 245, 249–50 (5th Cir.), *cert. denied sub nom. Chic Magazine, Inc. v. Braun,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984).

■ The Fifth Circuit held last year that the determination whether a person is a public figure is a question of law for the court to decide. *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433 (5th Cir.1987). In *Trotter* the court adopted the D.C. Circuit's recently promulgated three-prong test for deciding the limited purpose public figure question. *Id.* at 433–34 (adopting test set forth in *Tavoulareas v. Piro,* 817 F.2d 762, 772–73 (D.C.Cir.1987) (en banc)). The district court must conclude that the following elements are satisfied before holding that a libel plaintiff is such a public figure: first, the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; second, the plaintiff must have more than a trivial or tangential role in the controversy; and third, the alleged defamation must be germane to the plaintiff's participation in the controversy.

■ Defendants posit that plaintiff is a limited purpose public figure with respect to controversial sales practices in the bulk meat or freezer beef retail sales industry.[6] They argue that there existed prior to the October 1983 "Bum Steer" broadcast a public controversy concerning this industry, generally, and Brueggemeyer, specifically. Defendants also assert that Brueggemeyer played more than a trivial or tangential role in the controversy and that the

---

6. The record reflects that this industry involves the sale of beef in volume (such as entire car-casses, sides, and multiple cuts) to retail consumers.

20/20 broadcast related to Brueggemeyer's role in the controversy. Brueggemeyer responds that defendants have failed to identify a particular public controversy and to prove that Brueggemeyer thrust himself to the forefront of a particular controversy in order to influence the resolution of the issues involved (because plaintiff did not invite public attention to his views to influence others, did not voluntarily inject himself into a public controversy, did not assume a position of prominence in any public controversy, and did not maintain regular and continuing access to the media), and have failed to prove that the defamatory statements were germane to Brueggemeyer's participation in a particular public controversy.

–1–

The summary judgment evidence reflects that there was a public controversy concerning the bulk meat and freezer beef retail sales industry, in general, and Brueggemeyer, in particular, prior to the 20/20 broadcast in October 1983. People were discussing the issue and people other than the immediate participants in the controversy were likely to feel the impact of its resolution.

Defendants have adduced several articles from newspapers, BBB publications, and trade publications regarding deceptive trade practices allegedly committed in connection with bulk meat and freezer beef sales. A June 1973 article in *The Fresno Bee*, Fresno, California, concerned legal action undertaken against a Fresno meat market for allegedly "making false and misleading representations in their sales." A November 1974 article in *The BBB Bulletin*, a publication of the BBB of Central Oklahoma, concerned complaints made to other BBB's and law enforcement agencies regarding certain Brueggemeyer-connected retail volume meat outlets. The December 1979 article, noted above, in *The Dallas Morning News*, Dallas, Texas, reported that consumer fraud investigators in Texas and other states had labeled Brueggemeyer-owned outlets as "classic textbook examples of 'bait-and-switch' frauds." The newspaper also reported that the U.S. Department of Agriculture had initiated action to withdraw food stamp certification from certain Brueggemeyer stores, and reported extensively the nature and some details of several consumer complaints made against Brueggemeyer.

In an August 1981 article, *The Fresno Bee* reported that Brueggemeyer, Wolfe, and a local outlet, had agreed to pay a $100,000 penalty to three California counties in settlement of bait-and-switch false advertising charges. *Cocoa Today*, a Florida newspaper, published in June 1977 an article recounting the arrest of the manager of a Brueggemeyer-controlled bulk meat outlet on charges that the manager had used illegal sales tactics, including delivering cuts of beef not ordered, delivering less than the promised amount, and drawing customers in by using the bait-and-switch method.

The summary judgment record contains other articles, dating back to 1965, which pertain to bulk meat sale bait-and-switch and other deceptive sales tactics. Included in the record are those published in *Better Business* (September 1965, Denver, Colorado); *The Cincinnati Enquirer* (December 1965, Cincinnati, Ohio); *The National Provisioner* (December 1966, trade publication); *Foster's Daily Democrat* (February 1967, Dover, New Hampshire); *The Wall Street Journal* (August 1967); *News Summary* (January 1968, Federal Trade Commission); *Consumer Reports* (September 1974); *Meat Plant Magazine* (July 1975, trade publication); *The Kansas City Star* (February 1977, September 1977, November 1977, March 1978, May 1978, Kansas City, Missouri); *The Kansas City Times* (April 1977, September 1977, Kansas City, Missouri); *BBB Safeguard*, No. 20 in the series "Your Money's Worth," entitled "Freezer Beef" (1978, BBB, Dallas, Texas); *The Louisville Times* (May 1981, Louisville, Kentucky); *The San Francisco Chronicle* (November 1982, San Francisco, California); *The Columbus, Ga. Enquirer and Ledger* (November 1982, Columbus, Georgia); the *Tucson Citizen* (January 1983, Tucson, Arizona); *The Arizona Daily Star* (January 1983, Tucson, Arizona);

*The Arizona Republic* (May 1983, Arizona); *Better Business Bureau Bulletin* (May 1983, Waco, Texas); *Gazette–Journal* (June 1983, Reno, Nevada); and *The Press Democrat* (July 1983, Santa Rosa, California).

–2–

The court next decides whether plaintiff had more than a trivial or tangential role in the public controversy, and concludes that he did.

Defendants have demonstrated, without dispute, that in May 1983 an officer of the San Angelo, Texas BBB wrote to ABC complaining about bait-and-switch operators in the freezer beef industry. The letter specifically mentioned Brueggemeyer as a problem operator.

At the May 1983 meeting of BBB District Five (which includes the states of Louisiana, Texas, Oklahoma, New Mexico, Colorado, and Arkansas), one of the main topics discussed was deceptive business practices in the freezer meat industry. As a result, the bureaus in the District Five states set up a resource bank to deal with consumer protection problems in the industry. Brueggemeyer was identified at the meeting as one of several problem operators. Also in May 1983, the Texas Attorney General filed suit against Brueggemeyer alleging the commission of deceptive trade practices.

In July 1983, Kenneth Bassham, a California food and drug investigator, issued a detailed eight-page report that was highly critical of "unscrupulous actions" of firms under the control of Brueggemeyer, Wolfe, and others. Likewise, during the summer of 1983 the Dallas BBB began investigating Brueggemeyer's Dallas area stores. In October 1983, following the 20/20 broadcast, the Dallas BBB published a report which criticized B & W Service Company, of which Brueggemeyer was president, for using bait-and-switch tactics to sell bulk

beef at inflated prices to unsuspecting consumers located across the country.[7]

According to the chief criminal investigator of the Sacramento County, California district attorney's office, prior to the 20/20 broadcast the investigator had investigated "at least four separate instances of the use of 'bait and switch' sales tactics by bulk freezer beef companies operating in California and controlled by Robert Brueggemeyer of Grand Prairie, Texas." As a result, the Sacramento County district attorney filed civil complaints against Brueggemeyer and several entities owned or controlled by Brueggemeyer. In 1974, 1975, and 1978, the Sacramento County Superior Court issued permanent injunctions in three civil actions against Brueggemeyer, Wolfe, and/or 14 entities. The Sacramento County investigator also testified by affidavit that, in the late 1970's and early 1980's, "there clearly was a major controversy between law enforcement officials and consumer protection agencies, on the one hand, and certain bulk freezer meat operators, on the other hand, regarding the legality of various questionable advertising and sales practices." Brueggemeyer's "business operations definitely played a major role in this controversy in California, as his network of 'bait and switch' meat stores was the most prominent and the one that seemed to attract the greatest number of customer complaints." The investigator also stated that, prior to the 20/20 broadcast, Brueggemeyer's California stores "had been the subject of much adverse publicity;" for at least ten years prior to the broadcast, Brueggemeyer's name was well-known among the California law enforcement communities in the areas in which he operated; and among such officials Brueggemeyer "had a reputation ... as the organizer and controller of, and driving force behind, the largest 'bait and switch' bulk meat operation in California."

In 1982, Brueggemeyer was involved in Alabama in a public controversy regarding

---

**7.** The court recognizes that this report was published subsequent to the "Bum Steer" broadcast. The court concludes, however, that this type of post-publication evidence is probative of pre-publication conditions. *Cf. Hutchinson v. Prox-* *mire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

his sales practices, which were described by an Alabama official as the "biggest bait and switch operation there was in the country." Prior to June 3, 1983, a Shreveport, Louisiana television station, KTBS–TV, ran a story on practices alleged to be taking place at a local Brueggemeyer freezer meat store.

Brueggemeyer was also the subject of media attention in 1974 when the Associated Press and three Dallas, Texas television stations carried stories stating that five Brueggemeyer and Wolfe companies in the state of Washington had been ordered to make restitution to 1,400 customers. He was the subject of such attention again, in 1975, when *The Dallas Morning News* reported that he had sued[8] the Associated Press and the three Dallas television stations for carrying the story.

In his summary judgment response, Brueggemeyer concedes: that he has been sued individually by several consumer agencies for alleged violations of consumer laws and that stores in which he has ownership interests have been similarly sued; and that in several instances he has been investigated by the media and associated with meat stores being investigated or sued.

■ Brueggemeyer contends he cannot be a public figure, however, because he did not thrust himself to the forefront of a particular public controversy in order to influence the resolution of the issues involved. He argues in particular that he did not invite public attention to his views to influence others, he did not voluntarily inject himself into a public controversy, he did not assume a position of prominence in any controversy, and he did not maintain regular and continuing access to the media.

The court rejects the assertion that Brueggemeyer cannot be a public figure because he did not, of his own volition, undertake to become one. It is sufficient that Brueggemeyer "voluntarily engaged in a course that was bound to invite attention and comment." *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir. 1978) (quoting district court opinion, 411 F.Supp. 440, 445 (S.D.Ga.1976)). According to the summary judgment record, the course of conduct in which Brueggemeyer engaged generated consumer complaints, government legal actions, BBB investigations, and media attention.

The court also eschews Brueggemeyer's media access argument. The circuit court in *Trotter* held that media access is a general, rather than limited, factor to be used to distinguish public figures from private libel plaintiffs and observed that the Supreme Court has viewed significant involvement in public controversies as more important. 818 F.2d at 436. Accordingly, assuming *arguendo* that Brueggemeyer's media access is limited, the court finds the other factors sufficient to conclude plaintiff is a public figure.

–3–

The final *Trotter* element inquires whether the alleged defamation was germane to the plaintiff's participation in the public controversy. The court concludes that it was. The transcript of the "Bum Steer" program, set out as an appendix, plainly demonstrates that the telecast dealt specifically with Brueggemeyer's alleged business practices in bulk meat sales and was directly pertinent to the public controversy identified above.

### C.

■ Having determined that Brueggemeyer is a limited purpose public figure, the court next decides whether defendants have carried their summary judgment burden, *see* Fed.R.Civ.P. 56(c), and whether plaintiff has satisfied the *Anderson* summary judgment test for raising an actual malice fact question.

Defendants have denied that they published the statements in question with actual malice and have supported these verified

---

8. In *Brueggemeyer v. Associated Press,* 609 F.2d 825 (5th Cir.1980), then District Judge Higginbotham (now of the Fifth Circuit) granted summary judgment in favor of the defend-

ants on the ground that the news reports were substantially true. The Fifth Circuit affirmed. *Id.* at 826.

statements with extensive evidence regarding how they researched the "Bum Steer" story and attempted to corroborate the statements published in the broadcast. Brueggemeyer is thus obligated to furnish summary judgment evidence of his own from which a jury could reasonably find, by clear and convincing evidence, that defendants [9] acted with actual malice; that is, that they knew the statements they published were false or acted in reckless disregard for the truth. Reckless disregard for the truth, as explained above, means that one acts with a high degree of awareness of probable falsity [10] or in fact entertains serious doubts as to the truth of his publication.

Defendants contend the evidence cannot support a reasonable jury finding of actual malice under a clear and convincing evidence standard. According to defendants, the statements plaintiff challenges constitute either pure opinions, and are thus not actionable under federal or Texas law, or are statements of fact that were based on reliable sources and were confirmed either by public documents or other reliable documentation.

Defendants also rely upon their own course of conduct to dispel an actual malice fact question. ABC was made aware of the potential story by an officer of the San Angelo, Texas BBB, who informed ABC that plaintiff was one of the "problem" operators in the bulk meat industry. ABC committed a correspondent (defendant, Stossel), a producer (defendant, Lange), two production assistants, and a summer intern, to investigate the matter. The investigation took about five months and ABC interviewed approximately 89 people in preparing the telecast. The people interviewed included BBB officials, law enforcement personnel, meat experts, consumers, Brueggemeyer's attorneys, and a brief conversation with the plaintiff, himself, in which he was requested to do an on-camera interview. ABC reviewed court papers and pleadings, documents filed with government agencies, and BBB publications. The supporting material obtained by ABC in advance of the broadcast exceeded 3,000 pages of documents.

The ABC personnel involved with the broadcast have testified under oath that each believed the factual statements in the broadcast to be true. Plaintiff has conceded that he has no personal knowledge that ABC either knew the alleged defamatory statements to be false or in fact entertained serious doubts about their truth.

In response to the summary judgment motion, plaintiff has culled from his 24 defamation claims three statements which he contends the jury can reasonably infer were made with actual malice. Plaintiff also proffers an expert opinion and challenges the reliability and veracity of one of defendants' summary judgment affiants. With reference to specific defamation claims, Brueggemeyer focuses first upon the segments of the broadcast that state he personally [11] burned out stores and instructed his employees do so; plaintiff contends the summary judgment record shows that ABC and Lange knew plaintiff did not personally burn out or order his stores burned. Plaintiff points second to the portion of the story that claims the meat stores sold inferior quality meat, good only for dog food. Brueggemeyer alleges that the summary judgment record contains clear and convincing evidence that ABC knew this was not true because their "meat

9. Little of Brueggemeyer's evidence is directed at defendant, Stossel, the correspondent on "Bum Steer." Although the court concludes that plaintiff's summary judgment evidence is otherwise inadequate, with respect to Stossel it is particularly meager.

10. Plaintiff apparently does not contend that defendants acted with knowledge that the statements they published were false; the inquiry is thus limited to whether they recklessly disregarded the truth.

11. In his summary judgment response, Brueggemeyer initially attacks ABC's statement that plaintiff personally burned out stores. Plaintiff's underlying argument, however, focuses only upon ABC's supposed knowledge that "Brueggemeyer did not order his stores burned." The court therefore deals only with this discrete portion of the argument.

expert" and informants told ABC the meat was of excellent quality. Brueggemeyer asserts third that the statement in the broadcast that Brueggemeyer would not sell advertised specials but instead engaged in bait-and-switch tactics evidences actual malice; according to plaintiff, ABC knew in advance of the telecast that Brueggemeyer would sell the specials and nevertheless chose to claim otherwise. Brueggemeyer also insists that, because as part of its investigation ABC used undercover shoppers who were given the beef they purchased (paid for by ABC) and ABC did not disclose this to the viewing audience, the jury may permissibly infer "that all the shoppers were influenced by ABC not to buy the advertised special."

In addition to alleged defamatory statements, plaintiff relies fourth upon an "evaluative assertion analysis" performed by an expert witness who assayed the content of the words used in the broadcast against unused outtakes, and opined that the defects she found in the "Bum Steer" broadcast were intentional. Plaintiff contends fifth that defendants' reliance upon the affidavit testimony of John McNeur ("McNeur") can serve as a basis for an inference of actual malice because McNeur is a convicted perjurer and has recanted and cleared-up portions of his affidavit testimony at a subsequent deposition. The court examines each of the five contentions, in turn.

–1–

The 20/20 broadcast accused plaintiff of instructing employees to "burn out" stores. A former employee, Jack Fitzpatrick ("Fitzpatrick"), defined the term to mean "go up there and screw the public as bad as you can." Another ex-employee, a confidential informant identified only as "former employee," explained that the term meant: "You'd hit a town as hard as you can until the heat comes down, and then you exit."

Plaintiff contends, for several reasons, that ABC and producer Lange knew plaintiff did not order his stores burned. Plaintiff begins with a transcript of an interview with "former employee" in which the ex-employee states "I have not been involved in a burner with this company. I have with other companies but not with this company." Plaintiff then cites producer Lange's deposition in which counsel inquired whether Lange recalled the statement made by "former employee." Lange testified that he would have to look at a document to refresh his recollection, that the ex-employee may have said something to that effect but that Lange would be unable to discuss the subject without reviewing the document. Lange also testified that "former employee" may have told him about experiences burning out stores for other meat companies but Lange did not recall. Plaintiff insists Lange's deposition testimony permits a reasonable inference of actual malice because, despite the ex-employee's clear statement that he was not involved with burnouts for any Brueggemeyer store, producer Lange conceded that the reference to burn out used in "Bum Steer" was to Brueggemeyer's operation.

The court concludes that this evidence is insufficient to permit a finding of actual malice under the clear and convincing evidence standard. In preparing the 20/20 broadcast, defendants did not rely in isolation upon the information disclosed by the ex-employee. The summary judgment record demonstrates that the defendants obtained information from a number of sources, including a representative of the San Angelo, Texas BBB, the Federal Trade Commission ("FTC"), and a State of Alabama food and drug inspector. The court holds that a reasonable jury could not find actual malice, by clear and convincing evidence, based upon a single instance of questionable information, when such information is weighed in the broader context of ABC's total research efforts.

Moreover, defendants point to another portion of the "former employee" interview in which the interviewee explained the term "burning out" a store and stated that stores worked off fictitious names in order to prevent tracing them to Brueggemeyer, "for the reason being that if they are shut down, and ninety percent of the time, a *burner* is shut down after a period of a month or two months...." (Emphasis

added). This part of the interview, when coupled with the portion on which Brueggemeyer relies, would preclude a jury from reasonably finding, by clear and convincing evidence, that defendants acted with actual malice. Further, that producer Lange could not remember at his deposition, taken some three years later, the exact content of the "former employee" interview, likewise cannot satisfy the onerous actual malice standard.

Plaintiff next assails defendants' reliance upon Fitzpatrick as a source for the statement that Brueggemeyer instructed others to burn out stores. Plaintiff contends the evidence regarding Fitzpatrick clearly and convincingly raises a reasonable inference that defendants acted in bad faith and with recklessness so as to constitute actual malice. In this regard, plaintiff points to evidence that Fitzpatrick was known to defendants to have a drinking problem, to be a dreamer, to be a purveyor of wild tales, and to be a exaggerator. Plaintiff asserts that Fitzpatrick had been drinking prior to, and was drunk during, the filming of his interview, and that Stossel and Lange knew Fitzpatrick had been drinking on the day of the interview. Plaintiff contends actual malice is also adequately raised by portions of the interview which demonstrate Fitzpatrick was exaggerating or in which Fitzpatrick explicitly or implicitly conceded he was exaggerating. Plaintiff also points to a telephone interview with Lange during which Fitzpatrick exaggerated the facts regarding a physical attack that Brueggemeyer allegedly made upon him. Plaintiff contends Lange completely disregarded evidence regarding Fitzpatrick's questionable credibility or even sanity in accepting Fitzpatrick's version of what he had to say about Brueggemeyer and that this evidence is sufficient to infer that Lange expressed an attitude of bad faith.

The court rejects the contention that this evidence is sufficient to require a trial. Plaintiff's arguments overlook the critical inquiry—whether defendants reasonably believed that Fitzpatrick was telling the truth when he leveled the accusation in question. The record does not raise a reasonable inference that defendants possessed a "high degree of awareness of probable falsity," see Gertz, 418 U.S. at 332, 94 S.Ct. at 3003, or "entertained serious doubts as to the truth of [their] publication," see St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325. In advance of interviewing Fitzpatrick and in preparation for the broadcast, defendants contacted prosecutors, food and drug inspectors, consumer protection officials, and meat industry experts. These persons informed defendants about plaintiff's meat operations. Fitzpatrick was suggested to ABC as one who had cooperated in the past with law enforcement officers; ABC asked Fitzpatrick to confirm from an insider's viewpoint information that other sources had already provided ABC.

Even the narrow evidentiary predicate on which plaintiff relies shows that defendants acted with an acceptable First Amendment degree of care. Lange testified that he and Stossel were concerned that Fitzpatrick had been drinking. Rather than accept his statements with credulity, Stossel and Lange decided they had a "reliable system of checking on what he was going to say." They determined to do the interview and to decide afterward whether it was sufficiently reliable for use. Lange also felt certain he had confirmed, through multiple sources, anything Fitzpatrick told ABC concerning plaintiff's meat operations.

The truth concerning alleged misfeasors must occasionally be derived from unseemingly sources. The First Amendment does not require that one who speaks on a public issue do so based only on inviable sources; instead, the First Amendment inquires whether the sources are sufficiently perfidious to cause the publisher to believe the information is probably false or to prompt the publisher seriously to doubt the truth of what the source has revealed. The court concludes that a jury could not reasonably find, by clear and convincing evidence, that defendants acted with actual malice by relying upon what Fitzpatrick told them.

–2–

Plaintiff next attempts to present an actual malice fact question regarding the broadcast statement that Brueggemeyer and the meat stores sold inferior quality meat, good only for dog food. Plaintiff contends the record contains clear and convincing evidence that ABC knew this was not true.

In support of this proposition Brueggemeyer relies upon statements by Jimmy Klein ("Klein"), a butcher hired by ABC to evaluate meat purchased at a Brueggemeyer store, who was interviewed on the "Bum Steer" telecast. Plaintiff points to excerpts from Klein's interview where he states a particular cut of meat "is a decent piece o' meat" and notes that it is "of choice quality, 'cause you can tell by the marbling in here." Brueggemeyer also notes that Fitzpatrick stated in his interview with ABC that customers "never got cheated on as far as quality of meat...."

The court agrees with defendants that these examples are isolated. Klein elsewhere in his interview criticized both the quality and price of the meat he examined. Klein opined that an ABC undercover shopper had paid almost $200 too much for meat purchased from a Brueggemeyer store and that the charges were "not the going rate from legitimate dealers." Plaintiff also overlooks that ABC retained a second independent butcher, Dave Roberts ("Roberts"), who inspected meat purchased by an undercover shopper in Ohio. Roberts confirmed that the shopper did not get a very good deal from plaintiff, either with respect to quality or price. Roberts specifically criticized the quality of several cuts of meat and concluded that the customer was "pretty well taken" given the price paid.

In addition to the opinions of Klein and Roberts, ABC was aware of the assertion by BBB San Angelo, Texas that plaintiff had engaged in deceptive meat sales practices and ABC had evidence from other media reports, government investigators, and testimony from a 1982 criminal trial in Alabama, that the meat was of deceptively poor quality. Defendants also possessed copies of numerous complaints and petitions filed against plaintiff and his meat companies in which these entities were accused of selling inferior meat. Defendants also had an Oklahoma BBB bulletin, and a State of Alabama food and drug inspector's statement, which corroborated plaintiff's alleged tactics. The court concludes that a reasonable jury could not, by clear and convincing evidence, find from the isolated Klein and Fitzpatrick examples, and in the face of the other evidence that defendants possessed, that defendants acted with actual malice.

–3–

Plaintiff's next complaint deals with his alleged bait-and-switch tactics. The 20/20 broadcast stated that plaintiff was engaged in bait-and-switch and that "everyone [ABC] talked to told us there is no way Brueggemeyer's store would sell us its advertised special." Plaintiff alleges that ABC knew the Irving, Texas salesman who was shopped undercover would sell the advertised 89¢ per pound special and that the undercover shoppers decided on their own to purchase the more expensive meat. Plaintiff also contends that, because ABC failed to tell its viewing audience that the recruited shoppers were given, at ABC's expense, all the beef they purchased, the jury can infer that the shoppers "were influenced by ABC not to buy the advertised special." According to plaintiff, ABC knew its shoppers were not refused the special but nevertheless reported otherwise in the broadcast. In support of these propositions, Brueggemeyer relies on a taped exchange between the Irving, Texas salesman and two undercover shoppers during the course of which the salesman states, "But if you use more hamburger, buy the stuff for 89 cents."

As before, plaintiff has attempted to play an isolated example against substantial contrary evidence in order to create a reasonable inference of actual malice. ABC conducted four undercover shoppings of Brueggemeyer's meat stores. Plaintiff focuses upon only one of them. Plaintiff overlooks that, elsewhere in the salesman's pitch, he tells the undercover shopper "to get this eighty-nine cents, get that out of

your mind, ma'am. It's not there. Forget it. No. Forget it." Shortly thereafter the salesman states: "Forget eighty-nine cents, 'cause it ain't there. That's just the starting place...." A reasonable jury could not find, by clear and convincing evidence, that ABC acted with actual malice when it perceived from the entirety of this one transaction, as well as three other undercover shoppings, that Brueggemeyer's stores would not sell the special.

Plaintiff's contention that ABC's giving the shoppers the beef they bought creates an inference that the undercover shoppers had an incentive to buy higher priced beef is merely a theory, unsupported by the summary judgment record, and does not alone raise a reasonable inference of actual malice.

–4–

Plaintiff also seeks to avoid summary judgment on the basis of an expert witness' affidavit and analysis [12] that plaintiff contends constitutes "clear and convincing evidence of ABC's recklessness and knowledge under *St. Amant v. Thompson, supra.*" Dr. Marilyn A. Lashner, who is a consultant in media analysis and communications research and who holds a Ph.D. in communications, opines that ABC intentionally acted in a negative and biased manner, showed reckless disregard for the substance and tone of information that was presented to it by outside sources, and failed in its newsgathering procedures to exercise due care toward obtaining information about plaintiff that was valid, reliable, and free from errors. For the reasons set forth below, the court concludes that the expert's affidavit and analysis do not defeat defendants' summary judgment motion.

Defendants argue as a threshold matter that the court should reject Dr. Lashner's affidavit because it does not purport to be based upon personal knowledge. Defendants thus move in their reply brief to strike Dr. Lashner's affidavit.

Rule 56(e) provides, of course, that affidavits *shall* be based on personal knowledge; the requirement is mandatory. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2738 at 467 (1983). Notwithstanding this mandate, the court does not read the Rule to hold that an affidavit is defective if it does not state affirmatively that it is based upon the personal knowledge of the affiant. Indeed, a common sense reading of Rule 56(e) would permit the use of an affidavit that shows that the facts are based on personal knowledge, even though a rote recitation of the standard is not employed. *See Barker v. Norman,* 651 F.2d 1107, 1123 (5th Cir. 1981) ("affidavits must affirmatively show ... that the facts stated in the affidavits are based on the affiants' personal knowledge").

The court finds support for this conclusion in the Fifth Circuit's recent decision in *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77 (5th Cir.1987). In one of his last opinions for the court, Judge Hill addressed another requirement of Rule 56(e): that an affidavit shall show affirmatively that the affiant is competent to testify. Judge Hill wrote that the failure of a non-movant's affidavit to set forth affirmatively in the document that the affiant is competent to testify as to the facts to which he swore "does not necessarily doom [his] testimony." *Id.* at 80. This is so because affidavits are to be considered in conjunction with other types of evidence before the court, the papers of the opposing party are usually held to a less exacting standard than those of the moving party, and the court has in other contexts accepted evidence from the opposing party despite its failure to meet the technical requirements of Rule 56(e). *Id.* Instead, the district court is to determine whether the record, taken as a whole, demonstrates that the affiant's testimony meets the requirements of Rule 56; if so, it should be considered on a summary judgment motion. *Id.*

---

**12.** The affidavit consists of 10 pages and is accompanied by a one-page curriculum vitae, a 56–page "Analysis of Programming Broadcast by ABC," and a 35–page "Coding Manual."

■ Dr. Lashner's affidavit[13] does not, however, appear to set forth statements of fact or to state facts based upon personal knowledge. The record taken as a whole likewise does not satisfy the personal knowledge requirement. Some statements are prefaced with the phrase, "it is my opinion." Others not so prefaced, such as the assertion that ABC's "negative and other biases" "could not have happened by chance," "demonstrated extreme departure from linguistic neutrality and/or the bounds of evenhandedness," and were "the product of both substance and tone and were defined and augmented by word choice, figurative imagery, composite editing and other production techniques," are clearly statements of opinion. Similarly, her comments that ABC's "editorial creativity" "showed reckless disregard for the substance and tone of information that was presented to them by outside sources," that it departed from "a standard of objectivity," that the departure was "so extensive, pervasive and consistent that, almost certainly, [it] could not have happened by chance," and that it "demonstrated reckless disregard for a standard of objectivity," constitute opinion testimony, as does

Dr. Lashner's assertion "that ABC failed in its newsgathering procedures to exercise due care toward obtaining information" about plaintiff and his business "that was valid, reliable and free of error."

To the extent other portions of her affidavit constitute statements of fact, they are not shown to be based on personal knowledge. As the court discusses below, Dr. Lashner based her analysis on the transcripts of the 20/20 "Bum Steer" broadcast and transcripts of 11 outtakes, unedited videotape recordings of interviews conducted by ABC in preparation for the broadcast. In her affidavit, the expert asserts that the broadcast "actually projected information that, by substance and tone, misrepresented the original source information by distortion, exaggeration, falsification and, in at least one instance, outright fabrication," and contends that "ABC at best was reporting on information that was suspect by virtue of its having been gathered from interviews rife with interviewer bias and other contaminating interviewer behaviors." Dr. Lashner concludes by setting forth ten acts[14] which she contends ABC

---

13. As noted, attached to Dr. Lashner's affidavit is a 56-page "Analysis of Programming Broadcast by ABC." This unsworn document contains three pages of conclusions that generally track the opinions set forth in her affidavit. Because the attached document is unsworn, and is merely referenced in Dr. Lashner's affidavit without a statement swearing to its truth, the court does not examine it in particular. *See Oglesby v. Terminal Transport Co.*, 543 F.2d 1111, 1112 (5th Cir.1976); *cf. Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir.1987) (verified pleadings may be treated as affidavits if the pleading meets the Rule 56(e) affidavit requirements).

14. Dr. Lashner asserts that ABC acted inappropriately:

(a) by portraying Brueggemeyer and his enterprise, generally and specifically, in ways that were contradicted by the consensus of outside sources: including law enforcement experts, meat industry experts, former employees and shoppers;

(b) by attaching to the Brueggemeyer enterprise information that was actually supplied about the meat industry at large and, in at least one respect, by portraying the Brueggemeyer enterprise as worse than the way the sources portrayed the meat industry at large;

(c) by adopting and favoring the extreme positions of Jack Fitzpatrick, an obviously disgruntled former employee with an admitted record of drunkedness, even though contradictory positions were held by others, and even though Fitzpatrick's information on significant points was so far eccentric as to have been rejected by ABC and not included in the body of information actually broadcast;

(d) by adopting the positions of Steve Krut when he was talking from the perspective of a meat industry class from which Brueggemeyer was not excluded—information which was indistinguishable from Krut's references to the meat industry at large—even though obviously contradictory positions had been advanced by Krut when he was talking specifically about Brueggemeyer;

(e) by adopting the position of "Former Employee" when his references about the shops where he had worked were made from the perspective of a meat industry class from which Brueggemeyer was not excluded—even though obviously contradictory information had been advanced by "Former Employee" when he was talking specifically about his employment with Brueggemeyer;

(f) by portraying the Brueggemeyer butcher shops generally in ways that matched the sources' portrayal of only certain of the butcher shops in the Brueggemeyer chain;

committed and which "caused the program 'Bum Steer' to be infused with such biases, errors, misrepresentations and reckless disregard for a standard of objectivity." Certain of these assertions are statements of opinion; to the extent they are not, Dr. Lashner has not shown how her analysis of only the transcripts in question has provided her with the requisite personal knowledge.

Even if the affidavit complied with Rule 56(e), the court holds that the expert's opinions are too unreliable to be admitted in evidence; or, if they are otherwise admissible, that the probative value of the opinions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, and the opinions are thus excludable under Fed.R.Evid. 403.

The Fifth Circuit has recently held, in *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1123 (5th Cir. 1988) (per curiam), that in considering a Rule 56(c) motion opposed by expert testimony, "the trial court has broad discretion to rule on the admissibility of the expert's evidence." The district court "may inquire into the reliability and foundation of any expert's opinion to determine its admissibility." *Id.* (citing *Soden v. Freightliner Corp.,* 714 F.2d 498, 502 (5th Cir.1983); *see also Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987)). In *Washington* the Fifth Circuit affirmed, as within the trial court's discretion, the court's decision to exclude expert testimony that lacked foundation and was unreliable. 839 F.2d at 1123.

The Fifth Circuit also instructs that an unsupported opinion's lack of reliable support may render it more prejudicial than probative, making it inadmissible under Rule 403. *Viterbo,* 826 F.2d at 422 (citing *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1035 (5th Cir.1984) (evidence admissible under Rule 703 must satisfy Rule 403 which excludes evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury")).

To understand why plaintiff's expert testimony is unreliable and lacks foundation, or why it would be excludable under Rule 403, it is important to return to the ineluctable question presented in a public figure libel case: whether the publisher acted with actual malice, defined as knowledge that the publication was false or a high degree of awareness of probable falsity or that the publisher entertained serious doubts as to the truth of the publication. In the proper context, it can be seen that plaintiff seeks to make too much of Dr. Lashner's opinions and that the expert's empirical predicate is too circumscribed to be reliable or to assist the jury in its determination of the relevant facts.[15]

The court turns to the latter consideration first and holds that Dr. Lashner has grounded her research on too narrow a factual predicate to be reliable or to assist the jury in understanding actual malice. She states in her affidavit and supporting exhibits that her analysis is based upon a transcript of the 20/20 broadcast and tran-

(g) by attaching to Bob Brueggemeyer, personally, source information actually supplied about B & W Service Company and the butcher shops, generally and specifically, wherein Brueggemeyer per se was not mentioned;
(h) by introducing bias and other contaminants into interviews with outside sources in ways that encouraged responses conforming to the interviewers' present production goals even though such interviewer behavior is known to lower the reliability and/or validity of the information gained;
(i) by failure to specify in their interviews the criteria by which questions should be answered and failure to undertake measures that would prevent interviewees from freely intermingling and confusing information supplied

about Brueggemeyer with that supplied about the meat industry at large;
(j) and finally, by failure in production of the program to ascertain the true focus of much of the information supplied by outside sources and to distinguish and identify in the broadcast when interviewees were talking about the Brueggemeyer enterprise and when they were talking about the meat industry at large.

**15.** The court is obligated to make such a determination rather than simply to permit the jury to consider all expert testimony and give it appropriate weight. *See In re Air Crash Disaster at New Orleans, Louisiana,* 795 F.2d 1230, 1234 (5th Cir.1986).

scripts of 11 outtakes, unedited videotape recordings of previously held interviews representing the total body of available outtakes. To these sources she has applied "evaluative assertion analysis," which she states is "a technique that measures the multiple themes contained within sentences."

Dr. Lashner concedes, but does not adequately take into account, that the 20/20 broadcast "was necessarily the product of much newsgathering, not all of which was recorded in the outtakes." Instead, she states that her "research proceeded on the assumption that the body of combined outtakes reflected the gist of the substance on which the news report was based." Nowhere in her affidavit does Dr. Lashner justify the reasonableness of this assumption, and yet it is critical to the validity of her conclusions. The court has already recounted elsewhere the extensive work undertaken by ABC prior to the 20/20 broadcast. Dr. Lashner does not show how the "body of combined outtakes" reflects the "gist of the substance" of this extensive research. She assumes, without explanation, that the unedited outtakes "represent a standard of objectivity" and compares portions of the actual broadcast with this "standard" to determine whether the broadcast portions were "objective" or "not objective." The expert also employed "substance and tone of language" analysis to assay "linguistic neutrality" and/or "evenhandedness" for the purpose of determining whether a portion of the broadcast was "biased" or "not biased." [16]

The court concludes that the First Amendment requires more of a libel plaintiff than can be demonstrated by this limited approach. While Dr. Lashner has obviously submitted the "Bum Steer" broadcast and outtakes to close scrutiny, the actual malice determination is not to be so narrowly tailored where there is evidence, as here, that the publisher's newsgathering efforts were much broader in scope. Even in the summary judgment context, the libel plaintiff should not be permitted to put a publisher to the expense and burden of a trial on the basis of so constricted an examination of the publisher's conduct.

■ Even were the court to hold that the expert's analysis is not too narrow to be presented to a jury, the court nevertheless concludes that the expert's opinions are not probative of actual malice. Actual malice focuses on knowledge of falsity, a high degree of awareness of probable falsity, or serious doubts as to the truth of a publication. By contrast, the opinions of plaintiff's expert do not. Her opinion that ABC demonstrated a "reckless disregard" does not pertain to a reckless disregard for the truth but, instead, relates to a reckless disregard for a standard of objectivity. She opines that ABC and those with editorial responsibility "demonstrated extreme departure from linguistic neutrality and/or the bounds of evenhandedness," but does not squarely demonstrate that they departed from the truth. She asserts that ABC "showed reckless disregard for the substance and tone of information that was presented to them by outside sources," but does not show an awareness of probable falsity. She also states that ABC "failed in its newsgathering procedures to exercise due care toward obtaining information about Bob Brueggemeyer and his enterprise that was valid, reliable and free of error." This is not the correct legal standard, of course, which requires a showing of more than mere negligence. *See Braun,* 726 F.2d at 249.

The court recognizes that evidence of bias, and lack of objectivity and evenhandedness, may be probative of intent to act with actual malice. But in the face of the extensive evidence that defendants possessed regarding plaintiff, the court concludes that a reasonable jury could not rely on "bias and lack of objectivity and evenhandedness" opinion testimony alone to find by clear and convincing evidence that the defendants acted with actual malice.

---

**16.** Dr. Lashner defines "bias" in her analysis as "significant departure from a standard of lin-guistic neutrality and evenhandedness."

–5–

Plaintiff lastly assails defendants' reliance upon the affidavit of McNeur. Assuming, without deciding, the validity of plaintiff's contentions regarding McNeur, they are simply irrelevant and cannot raise a material fact issue. Defendants neither talked to nor used McNeur as a source for the 20/20 broadcast. They relied upon him to corroborate their defense of no actual malice. Defendants have demonstrated their entitlement to summary judgment even without the McNeur affidavit.

### III.

For the foregoing reasons, the court concludes from the summary judgment record that plaintiff is a limited purpose public figure and that he has failed to adduce evidence from which a jury could reasonably find, based upon clear and convincing evidence, that defendants acted with actual malice. The court grants defendants' motion for summary judgment and has today entered a judgment dismissing plaintiff's claims with prejudice.[17]

SO ORDERED.

### APPENDIX

HUGH DOWNS: Good evening. I'm Hugh Downs. And this is 20/20.

ANNOUNCER: On the ABC Newsmagazine, 20/20, tonight:

\*   \*   \*

JACK FITZPATRICK: They called it a burnout. He'd call me up and say, "Burn this store."

JOHN STOSSEL: What'd that mean?

MR. FITZPATRICK: That means go up there and screw the public as bad as you can.

ANNOUNCER: Thousands of unsuspecting customers, victims of bait and switch. The bait: choice beef at bargain prices. The switch: inferior meat at outrageous prices. John Stossel documents the corporate fronts, fly-by-night stores, unscrupulous salesmen and the man behind it all, in a report we call the "Bum Steer."

\*   \*   \*

DOWNS: Up front tonight, fraud at the butcher shop. This story is called "Bum Steer," and you'll see how apt that is in a moment. You know, 20/20 reports frequently on schemes that prey on the unwitting, but this one is in a special class, because it's nationwide, and because of the bald-faced way it wrongs trusting customers and separates them from their money. You could have been a victim of this operation—but not in the future, we believe, after seeing the story patiently pieced together by consumer correspondent John Stossel. John?

JOHN STOSSEL: Hugh, it's easy to get ripped off buying meat, because although we eat a lot of it, most of us don't know much about it. We're particularly ignorant when it comes to buying meat in this form, as a side of beef. The idea here is that you'll pay a lower price per pound because you're buying the whole thing—you know, the discount for buying in volume. Of course, some of it's fat and bone, and you have to cut that away to get at the steaks. Still, you can save money buying meat in bulk, but not at the places you're about to see, because one man is running a scam. It doesn't look like an organized scam: the stores themselves look like small neighborhood butcher shops.

[*voice-over*] Colorado Beef, Rancho Cordova, California; Iowa Beef, Shreveport, Louisiana; Rancher's Beef, Columbus, Ohio.

STEVE KRUT, meat industry expert: At any given time there may be as many as 50 of his operations operating throughout the country.

STOSSEL [*voice-over*]: Cattlemen's Beef, Xenia, Ohio; Black Angus Meats, Arlington, Texas.

FORMER EMPLOYEE: Different names for every store—different companies. It's

**17.** Without leave of court, defendants submitted a March 31, 1988 letter and an April 1, 1988 affidavit in an effort to bring certain recent cases and documents to the court's attention. The court has not considered any of these materials in reaching its decision on the summary judgment motion and so has not invited plaintiff to respond to them.

very hard to trace a store back to the home office.

STOSSEL [*voice-over*]: The Chopping Block, Wichita, Kansas; Meat Mart, Huntsville, Alabama.

JIMMIE CHERGOTAKIS, Alabama investigator: Huntsville, Alabama, he lasted about a week and a half. In Birmingham, he stayed down there. I think I gave him just three months down there.

STOSSEL: The stores these men are talking about are all run by one man. Bob Brueggemeyer of Texas. He's making millions of dollars.

Mr. CHERGOTAKIS: It's nothing but larceny. Not only is it a con game, but it's larceny, to me.

STOSSEL: Jimmie Chergotakis is a food and drug investigator for the state of Alabama. Steve Krut works for the American Meat Processors Association. This man worked for Brueggemeyer until last April; at his request we've hidden his face and disguised his voice. They are just three of more than 20 meat industry experts, police, prosecutors, Better Business Bureau officials, who told us about Mr. Brueggemeyer and his meat store empire. [*on camera*] They say when it comes to meat and fraud, Brueggemeyer is the biggest and the best. His headquarters are here just outside Dallas, Texas—B & W Service Company. It's from here that he controls the operations in all his stores.

[*voice-over*] Like Butcher Boy Meats in Lubbock, Texas. The state of Texas sued this store and Brueggemeyer for deceptive trade practices and conspiracy. So we called and asked our affiliate to take a picture of the place. But Brueggemeyer's people aren't anxious to have their stores on television. This man's the store manager.

MANAGER: What can I do for you, pardner?

CAMERAMAN: I just need some shots of the store.

MANAGER: What do you need shots of the store for?

CAMERAMAN: ABC News called and asked for some.

MANAGER: What do you mean, ABC News?

CAMERAMAN: 20/20.

MANAGER: I'll stand in front of the camera, then.

STOSSEL [*voice-over*]: The Texas lawsuit accuses Brueggemeyer of ripping off consumers with a very precise and practiced con game. It starts with an ad that offers big quantities of meat for an incredibly low price. The experts say the price is phony.

Mr. KRUT: They don't intend to sell you what is hanging in the cooler at the advertised price. They plan to sell you an awful lot more.

STOSSEL: Why not sell them the advertised specials?

FORMER EMPLOYEE: You lose money.

STOSSEL: You can't make money and—

FORMER EMPLOYEE: You lose money on it. You can't make money on that.

STOSSEL: So you trade them up to what, three, four—

FORMER EMPLOYEE: Whatever you want.

STOSSEL: How high did you get them?

FORMER EMPLOYEE: How high did I ever hit somebody?

STOSSEL: Yeah.

FORMER EMPLOYEE: Seven dollars a pound.

STOSSEL [*voice-over*]: It's a consumer fraud called "bait and switch." And everyone we talked to told us there is no way Brueggemeyer's store would sell us its advertised special. We decided to try. The store is in Xenia, Ohio. Bill, who lives near the store, volunteered to be our shopper.

BILL: Hi. Yeah, I had an appointment.

STOSSEL [*voice-over*]: ABC's Tony Pagano went along with a small camera hidden in his black shoulder bag.

BILL: I hear you got some meat.

SALESMAN: Yes, sir. I got a little bit.

STOSSEL [*voice-over*]: Bill said he wanted the small freezer special, 97¢ a pound, that was advertised in last night's paper. The

salesman said fine, then he gave Bill the sales pitch we were to hear at several Brueggemeyer stores.

SALESMAN: Use a lot of soup bones?

BILL: Define a lot. You know, we—

STOSSEL [*voice-over*]: "A lot," said the salesman, meant 50 or 60 pounds of soup bones. No thanks.

SALESMAN: Okay, how about the fat broth, d'you use a lot of that?

BILL: I don't know what it is.

SALESMAN: Suet.

BILL: You gotta give me—

SALESMAN: Just plain old fat.

BILL: I just—

SALESMAN: Chunks of fat. Do you use it?

STOSSEL [*voice-over*]: Who would use chunks of fat? Well, if you don't want fat, said the salesman, I better show you the 97¢-a-pound meat. It's mostly fat and bones. Here it is in the cooler.

SALESMAN: All that's fat in here. All this down in here is fat, right? Steaks are over here.

STOSSEL [*voice-over*]: The 97¢ meat contained so much fat and bone, says the salesman, that after it's trimmed, the meat you're left with would cost you $3.00 a pound. So instead he suggests—

SALESMAN: Could you use 300 pounds at a right price? I mean a damn good price.

STOSSEL [*voice-over*]: The salesman told Bill a much better buy was the already-trimmed meat for $2.00 a pound. And Bill bought it. The salesman told him his order contained mainly steaks and roasts. It didn't.

DAVE ROBERTS, independent butcher: This piece here I wouldn't sell it for a pot roast at all. It's just a piece of neck meat with a bunch of hamburger meat on it, is all it is.

STOSSEL [*voice-over*]: Dave Roberts runs an independent butcher shop near Brueggemeyer's store. We brought him the meat we bought, and he said—

Mr. ROBERTS: Actually, what you got there is amounted to a lot of junk.

STOSSEL [*voice-over*]: Because Dave is a competitor, he isn't likely to have the nicest things to say about someone else's meat, so we checked his prices on our own. It turns out that what Brueggemeyer sold us for $2.00 a pound, we could have bought here for $1.40 a pound. We would have saved about $170. Still, that's nothing compared to what happened to Irene Mayhorn.

IRENE MAYHORN, shopper: We just saw the ad in the paper, and we thought it would be a good deal, so we went to Rancher's Beef to, you know, make the purchase.

STOSSEL [*voice-over*]: She went to a Brueggemeyer store thinking she'd spend $300. By the time the salesman was through, she had a bill for $1,848.00. The salesman sold Irene 600 pounds of meat.

Ms. MAYHORN: We told him we didn't know whether it would fit in our freezer.

STOSSEL [*voice-over*]: She still thought she'd saved money, until she went to the trouble of weighing everything, and comparing it to what she would have paid in the supermarket. She found out Brueggemeyer's store cost her $600 more.

JACK FITZPATRICK, former employee: It was a flat-out con game.

STOSSEL [*voice-over*]: Jack Fitzpatrick worked for Brueggemeyer for five years, mostly in stores in Ohio and Indiana. Now he works for an honest butcher. Fitzpatrick explains that the reason they can get you to pay more than you intended, is that they have your visit planned out even before you get there. The stores allow no drop-in visits; you must make an appointment. The reason: that gives the salesman time to have a finance company run a credit check on you, to find out how much money you're good for.

Mr. FITZPATRICK: You might come in there thinking you're only going to buy $200, but the finance company told me that you're good for $2,000—that's how much you're gonna buy.

STOSSEL: You'd know that I had a credit rating that was good for $2,000, so you'd—

Mr. FITZPATRICK: And I'm gonna get you for $2,000.

STOSSEL: People would pay that.

Mr. FITZPATRICK: I'll guarantee you I could do it to you right now.

Mr. KRUT: You're looking at maybe $20,000 in a shop in one day, running seven days a week, running until the authorities ever decided—investigator close it down.

STOSSEL: That brings up another Brueggemeyer specialty: staying one step ahead of the law. His people are used to getting out of town quickly. It happens so often it was part of Jack Fitzpatrick's job.

Mr. FITZPATRICK: They called it a burn out. He'd call me up and say, "Burn this store."

STOSSEL: What'd that mean?

Mr. FITZPATRICK: That means go up there and screw the public as bad as you can.

FORMER EMPLOYEE: Burning a store? You'd hit a town as hard as you can until the heat comes down, and then you exit.

STOSSEL: Exit meaning you pack everything up and get out before the police come in?

FORMER EMPLOYEE: Exactly.

STOSSEL [*voice-over*]: He'll often just move to a new town and open up under a new name. Brueggemeyer's stores use more than 20 different corporate names.

Mr. KRUT: It's to disguise and confound the prosecuting authorities. They go on a paperwork chase that will consume a couple of months before they find out really who's behind the operation.

STOSSEL [*voice-over*]: As a result, although law enforcement officials have gone after Brueggemeyer for deceptive trade practices again and again, he's still in business. He just keeps moving his employees. This man, Cleve Singleton, was arrested for consumer fraud here at the Meat Mart store in Huntsville, Alabama. But after his arrest he worked at Brueggemeyer's Iowa Beef in Shreveport, Louisiana, and we found his name on a health permit issued to Brueggemeyer's Black Angus store in Irving, Texas, which happened to be another Brueggemeyer store we shopped. The shoppers were Lou and Barb Lenzer. They wanted to buy this 89¢ special. The salesman said, forget it.

BARB LENZER, volunteer shopper: He said to throw that 89¢ out of my mind.

SALESMAN: Forget this 89¢. Get that out of your mind, ma'am, it's not there. Forget it. No. Forget 89¢ 'cause it ain't there. That's just a starting place.

STOSSEL [*voice-over*]: It sure was. He switched the Lenzers up to more expensive meat. They paid $3.11 a pound. Again we took the meat to a legitimate beef dealer in the same area. He said Brueggemeyer charged [illegible] times too much.

JIMMY KLEIN, independent butcher: Yes. I would definitely say you were cheated, all right.

STOSSEL [*voice-over*]: And not for the last time. One more example: our final shopper is Nancy Webman. With her is ABC cameraman Les Solin, carrying the hidden camera. Nancy came closer than all our shoppers to actually buying the advertised special. In fact, she thought she'd bought it.

SALESMAN: If you want this one, I'll be glad to cut it up for you.

NANCY WEBMAN: Yeah, I want that.

SALESMAN: Okay.

Ms. WEBMAN: Okay.

STOSSEL [*voice-over*]: While she was waiting to have it cut up, the second salesman came over to tell her what he thought of the deal.

2nd SALESMAN: That's just junk.

STOSSEL [*voice-over*]: He offered her more deals, showed her more meat, gave her more prices, 'til she was thoroughly confused.

Ms. WEBMAN: How many pounds of meat are you going to end up with from this, or out of this?

STOSSEL [*voice-over*]: Then the salesman said he'd even drop the normal processing charge if she would just buy the higher priced meat.

Ms. WEBMAN: And no 22¢ a pound. No processing charge.

LES SOLIN: Why is there no processing charge on this one?

2nd SALESMAN: 'Cause I want to sell her that one ...

Mr. SOLIN: You want to—[laughs]

Ms. WEBMAN: [laughs] He's honest, at least, isn't he?

STOSSEL [voice-over]: Sure, he wanted to sell her that one: she paid almost twice what she would have paid in a legitimate store. Of course, maybe she was still lucky she didn't get the advertised special. California TV reporter Brad Willis did buy the special.

BRAD WILLIS, KCRA–TV: There's nothing here that you would serve to your family. A butcher might use some of this meat in ground beef; the only other use would be to give it to your dog.

STOSSEL [voice-over]: Half the meat Willis bought for his story was junk—huge hunks of fat wrapped up as meat. But this stuff that legitimate butchers throw away, Brueggemeyer sells. His ads make it sound good: "beef sides with extra sections." The extra sections are fat and bone, thrown in to add weight.

Mr. KRUT: This fraud, this racket goes on year after year, almost 20–some years now.

STOSSEL [voice-over]: And every year Brueggemeyer gets richer. He now owns more than 20 meat corporations and 75 stores. He controls this bank, this car dealership, and other businesses. [on camera] We called Mr. Brueggemeyer and to my surprise, he agreed to be interviewed. So we came here to Dallas and waited for him at the appointed hour in this hotel room. But he never showed up. Instead, he sent his lawyer, who said we had misunderstood. Mr. Brueggemeyer never intended to be interviewed. The lawyer also said Brueggemeyer is no crook, and his stores give people good deals.

[voice-over] In the past 11 years, Brueggemeyer has been sued by state and local governments 13 times. He's never been convicted, because instead of going to trial, he agrees to pay fines and not to engage in deceptive practices. So far, he's agreed to pay $180,000 in fines. At last report, he was still operating 75 stores in nine states.

[interviewing] How much money is he making?

FORMER EMPLOYEE: At least $50 to $100 million a year.

STOSSEL: Fifty million dollars a year?

FORMER EMPLOYEE: At least that much, at least that much.

STOSSEL: Profit?

FORMER EMPLOYEE: Ripping people off. People need to be aware of what they're doing. Go to the supermarket and save money.

STOSSEL: That's not to say you can't save money buying meat in bulk in a butcher shop. There are legitimate dealers, and now may be a good time to stock up. Just yesterday the U.S. Agriculture Department said that meat prices, which are unusually low now, will be high by next summer.

DOWNS: What about those places we used to see advertised, that sell you the freezer along with the meat?

STOSSEL: I think the main point there is that if you don't have a freezer, it probably doesn't pay to buy one just to stock up on meat. Freezers use lots of electricity, sometimes $10 a month. Whatever you save on meat, you may lose on electricity.

DOWNS: Thank you, John....