**John C. TROTTER, Plaintiff-Appellant,**

v.

**JACK ANDERSON ENTERPRISES, INC. and Jack Anderson, Defendants-Appellees.**

No. 86–2542.

United States Court of Appeals, Fifth Circuit.

June 5, 1987.

Keith G. Fabrizi, Trotter, Trotter & Fabrizi, Houston, Tex., James L. Branton, San Antonio, Tex., for plaintiff-appellant.

David J. Branson, Paul Getz Levenson, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for defendants-appellees.

Before RUBIN, RANDALL, and JOHNSON, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A Texas lawyer, who was president of a Guatemalan soft drink bottling company, sues a newspaper columnist for libel, contending that he was defamed by two of the columnist's articles. The articles described anti-union violence at the bottling plant in Guatemala and identified the plant management, and the Texas lawyer in particular, as the orchestrators of the violence. The district court granted the columnist's summary judgment motion on the grounds that the lawyer was a limited-purpose public figure and the lawyer had failed to show that the columnist harbored any actual malice. Because the violence had attracted the attention of major United States newspapers, public officials in the United States, and a significant segment of the public, it was an issue of public concern, and the lawyer's role as chief policymaker for the plant made him a public figure for that issue. Since the motion for summary judgment gave ample notice that actual malice was a matter to be litigated, the lawyer cannot excuse his failure to demonstrate actual malice on the ground that the columnist conceded the issue by not filing an answer to the complaint. The lawyer also cannot rely upon the district court's instructions to defer litigation of actual malice until the public-figure question was decided when he ultimately had an opportunity to prove actual malice. For these reasons, we AFFIRM the summary judgment.

I.

John C. Trotter, a lawyer living in Houston, served as president of Embotelladora Guatemalteca, a Coca-Cola bottling company in Guatemala City. In 1979, the nationally syndicated, political columnist Jack Anderson published two articles about a prolonged and violent labor conflict at Embotelladora. The first article appeared on March 20, 1979 under the caption: COKE CONTROVERSY. In five paragraphs, it described the murder of the union's financial secretary, the unsuccessful assassination attempt of a second union official, and action by Coca-Cola shareholders for imposition of "minimum labor standards" on franchise bottlers by the parent company. The sole reference to John Trotter was a sentence characterizing him as the manager of Embotelladora.

The second article, which appeared on October 15, 1979, contained twelve paragraphs. Anderson chastised President Jimmy Carter for ignoring the labor violence at Embotelladora. The columnist suggested that the President had not extended his human-rights campaign to Embotelladora because of his close ties to Coca-Cola. The article printed excerpts from a letter by United States Representative Donald Pease urging the President to intervene. One of the excerpts stated that there was " 'an unmercifully ruthless campaign of intimidation and terror orchestrated by the plant

management and its American owner, John Clinton [sic; actually, Clayton] Trotter.'" The article also quoted Pease as stating that Trotter "'appears firmly committed to destroying the union and has demonstrated his willingness to stop at nothing toward this end.... Union officials have been assassinated and their successors have been constantly harassed with death threats.'"

Trotter initiated his libel action against Anderson in Texas state court in March 1980. Promptly after removal of the case to federal district court in May 1980, Anderson moved to dismiss. In March 1984, the motion to dismiss was granted on the ground that the material quoted from Congressman Pease's letter was privileged and therefore could not serve as the basis for a libel suit. That decision was reversed by this circuit in an unpublished opinion. On remand, Anderson filed a motion for summary judgment on the grounds that Trotter was a public figure and that Trotter had conceded he could not show actual malice. The district court granted the motion.

Trotter raises three issues on appeal. He contends that he was not a public figure, that Anderson conceded actual malice by not filing an answer to the complaint, and that his failure to prove actual malice resulted from instructions by the district court not to litigate the issue.

## II.

The Supreme Court has identified two classes of public figures in addition to government officials: general-purpose and limited-purpose public figures. General-purpose public figures are those individuals who "achieve such pervasive fame or notoriety that [they] become[ ] a public figure for all purposes and in all contexts."[1] Such persons have assumed so prominent a role in the affairs of society that they have become celebrities.[2] "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society,"[3] an individual should not be characterized as a general-purpose public figure. Anderson does not contend that Trotter has established this kind of prominence either in American, or even Houston, society at large.

Limited-purpose public figures achieve their status by "'thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,'"[4] or because they "voluntarily inject [themselves] or [are] drawn into a particular public controversy."[5] If Trotter was a public figure, his status was of this limited type.

■ Whether an individual is a public figure is a matter of law for the court to decide.[6] This difficult determination cannot be made by the mechanical application of general rules. Indeed, defining a public figure has been likened to trying to nail a jellyfish to the wall.[7] In an effort to give shape to what might be a formless injury into limited-purpose-public-figure status, the District of Columbia Circuit has developed a three-step test: (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's

---

1. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974).

2. *Tavoulareas v. Piro*, 817 F.2d 762, 772 (1987) (en banc).

3. *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013.

4. *Wolston v. Readers' Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979) (quoting *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009).

5. *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013; *Braun v. Flynt,* 726 F.2d 245, 249–50 (5th Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984).

6. *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Tavoulareas,* at 772.

7. *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 n. 2 (5th Cir.1978).

participation in the controversy.[8] This test appears to be sensible, and we adopt it.

### III.

■ The first question, then, is whether the labor violence at Embotelladora was a public controversy. We find that it was. Because of the proximity of other Western Hemisphere countries to the United States, social and political turmoil occurring there has aroused particular domestic concern, more so when United States companies are implicated. The involvement of ITT in Chilean politics, for example, was subject to extensive public scrutiny. In the past decade, with the Sandinista revolution in Nicaragua, Central American countries have become a focus of national concern.

The labor violence at Embotelladora captured the attention of a diverse and broadly-based audience, including the media, political leaders, human-rights organizations, labor unions, and Coca-Cola shareholders. United States press coverage of the events at Embotelladora began in February 1977 when the Associated Press reported a Coca-Cola shareholders' resolution that charged Embotelladora with repressive actions including influencing the military police in Guatemala to intervene violently. Inquiries about the resolution were made by the *Atlanta Constitution* and the *Wall Street Journal*. An article on Coca-Cola in the October 1977 issue of the *Business and Society Review* devoted two of its four pages to the labor dispute at Embotelladora and the shareholder resolutions. The *New York Times* ran a front-page article on right-wing terror in Guatemala in March 1979 in which it discussed the labor violence at Embotelladora. Two months later, the *Wall Street Journal*, the *Atlanta Journal & Constitution*, and nationally syndicated columnist Milton Moskowitz reported charges of murder, bribery, and other abuses at Embotelladora that were raised by shareholders at Coca-Cola's annual meeting. In 1979, Coca-Cola also re-

ceived inquiries about Embotelladora from "60 Minutes," the *Atlantic Monthly*, the *Boston Globe*, *San Francisco Chronicle*, *Village Voice*, and *Los Angeles Times*.[9] The *New York Times* continued its coverage with an article in June 1980 detailing the violence at Embotelladora and the broadening of the shareholders' complaints into an international protest campaign and an article in April 1985 that described the finally resolved union fight as "one of the most publicized union fights in recent Latin American history."

Trotter dismisses much of the press coverage as irrelevant because it was published after Anderson's articles. Citing *Hutchinson v. Proxmire*,[10] Trotter observes that Anderson cannot invoke the public-figure defense if the allegedly defamatory articles themselves turned him into a public figure. Creating a public issue, however, is not the same as revealing one. The purpose of investigative reporting is to uncover matters of public concern previously hidden from the public view. We agree with the District of Columbia Circuit that the first newspaper to report on a pre-existing public dispute should not be held to a stricter standard of liability than those who follow.[11] To hold otherwise would undermine the purpose of the public-figure doctrine—encouraging debate on issues of public concern. Anderson's articles did not cause the later press coverage of the labor violence; the labor violence itself did.

Public officials in the United States also gave attention to the Embotelladora violence. In May, 1979, the Department of State reported to Coca-Cola that Guatemalan terrorists were planning to retaliate against officials of Embotelladora for the deaths of two labor union officials; in June, the State Department conveyed its official concern about the two deaths. Congressman Pease requested information from Coca-Cola about the violence at Embotelladora and sent two letters to Presi-

---

8. *Tavoulareas*, 817 F.2d at 772.

9. *Id.*, at 774.

10. 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

11. *Tavoulareas*, 817 F.2d at 775 n. 13.

dent Carter calling on him to intervene personally with Coca-Cola officials.

Human-rights organizations and labor unions also expressed concern about Embotelladora. In September 1979, Amnesty International cited the incidents of violence at Embotelladora in its critique of human-rights abuses in Guatemala, and, during 1979, eleven domestic labor unions called upon Coca-Cola to correct the problems at Embotelladora. The International Union of Food and Allied Workers protested the treatment of workers at Embotelladora beginning in 1977 and organized boycotts of Coca-Cola products in Europe in 1979–80.

Coca-Cola shareholder resolutions also brought public attention to the Embotelladora violence. Such resolutions were submitted from 1977–79 by the Interfaith Center on Corporate Responsibility, a group sponsored by the National Council of Churches, and the Sisters of Providence, a Catholic religious order headquartered in Indiana. They called on Coca-Cola to intervene on behalf of the union at Embotelladora. Evidence of a positive response by Coca-Cola resulted initially in withdrawals of the shareholder resolutions. After reports of increased violence and repression, however, the 1979 resolution was debated at the May annual meeting before being voted down. Trotter characterizes the shareholder resolutions as a purely private matter. Coca-Cola, however, is a major United States company, its shareholder resolutions reach a large audience,[12] and it has attained an important place in American culture. Indeed, a change in its formula dominated public discussion and debate. Not surprisingly, then, the press devoted the significant coverage already described to the shareholder resolutions.

The Embotelladora violence was widely reported in the media, cited by broadly-based organizations championing human rights, and viewed as a significant foreign policy issue by government officials. Consequently, it was a subject of legitimate public concern.

The second step of the limited-purpose-public-figure inquiry is whether Trotter had more than a trivial or tangential role in the controversy. The record reflects a prominent role for Trotter. According to his affidavit, he served as president of the stockholders of Embotelladora, a position which he characterized as "the equivalent of a chairman of the board of a Texas corporation." While Trotter contends that he had minimal involvement in the day-to-day operations of Embotelladora, as president, he had primary responsibility for general overall policy. Moreover, the newspaper articles, internal memoranda at Coca-Cola, the United States Department of State, Congressman Pease, the shareholder resolutions, and union officials at Embotelladora all attributed major responsibility for Embotelladora's labor policy to Trotter. The President of Guatemala sent a message to Trotter through the American Embassy in April 1979 expressing concern about the deaths of the two union officers and indicating that Trotter would be expelled from Guatemala or denied re-entry if anything of a similar nature happened again.

Trotter also undertook important efforts to influence the resolution of the shareholders' protests. After he was encouraged by Coca-Cola headquarters to discuss the shareholder resolutions with their authors, he met with them in Chicago in 1977 and in Guatemala in 1978. Trotter also suggested to Coca-Cola that he bring a defamation suit against the authors of the resolutions in order to squelch their activities. By virtue of his position at Embotelladora, then, Trotter was a central figure in important policy matters at Embotelladora, including the labor union controversy.

Trotter contends that he cannot have public-figure status because he did not actively "engage the public's attention"[13] and his name did not appear very frequently in the press. These facts are to be taken into account, but they are not decisive. While an individual can achieve public-figure status by aggressively seeking public

**12.** *Id.,* at 774.

**13.** *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013.

attention [14] or by exercising his access to the media,[15] an individual cannot erase his public-figure status by limiting public comment and maintaining a low public profile.[16]

Trotter correctly observes that access to the media in order to rebut defamations plays a significant role in distinguishing public figures from private libel plaintiffs,[17] but the Supreme Court has considered media access as only one factor in the public-figure analysis, and it has viewed significant involvement in public controversies as more important.[18] Indeed, only the latter factor is included in the definition of a limited-purpose public figure. In addition, the Court has invoked the media-access argument as a general, rather than individual, factor: public figures "usually" enjoy greater media access,[19] and, as "a class," they have greater access.[20] In sum, Trotter was sufficiently involved in the labor controversy at Embotelladora to become a limited-purpose public figure whatever the quantity of his public statements.

The third requirement of the public-figure analysis—that the alleged defamation was germane to Trotter's role in the controversy—was also satisfied. In alleging that Trotter was responsible for the anti-union violence, Anderson was also describing Trotter's role in the controversy at Embotelladora.

## IV.

■ Trotter challenges the finding that he has failed to show actual malice on two grounds. Citing Federal Rule of Civil Procedure 8(d),[21] Trotter first contends that, because the averments in his complaint, including an allegation of actual malice, were never denied in an answer, the district court should have held them admitted by Anderson.

Courts have applied Rule 8(d) in order to avoid unfair surprise by the party who failed to file a responsive pleading. In *Hall v. Aetna Casualty and Surety Co.*,[22] for example, the court prevented the defendant from asserting a new defense after the close of the plaintiff's case. In this case, however, Anderson's motion for summary judgment, while not a pleading responsive to a complaint,[23] gave Trotter plain notice that the question of actual malice was a matter to be litigated. Anderson's failure to file an answer, therefore, had no effect on the rights of Trotter and cannot serve as a ground for reversal.[24] The Federal Rules were adopted to ensure that pleadings would facilitate a decision on the merits. They "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." [25]

■ Trotter also contends that he was not given an opportunity to prove actual malice. The record belies this argument. Although the district court deferred consideration of the actual-malice question initially, that question became a central issue when the court granted summary judgment on the public-figure issue, denied Trotter's motion for reconsideration or certification for interlocutory appeal, and permitted Anderson to urge a motion for full summa-

**14.** *Tavoulareas,* 817 F.2d at 773–774.

**15.** *Hutchinson,* 443 U.S. at 136, 99 S.Ct. at 2688.

**16.** *Rosanova,* 580 F.2d at 861.

**17.** *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009.

**18.** *Wolston,* 443 U.S. at 164, 99 S.Ct. at 2705–06; *Gertz,* 418 U.S. at 344–45, 94 S.Ct. at 3009.

**19.** *Wolston,* 443 U.S. at 164, 99 S.Ct. at 2705; *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009.

**20.** *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, J., concurring).

**21.** Fed.R.Civ.P. 8(d) states in part that:
Averments in a pleading to which a responsive pleading is required ... are admitted when not denied in the responsive pleading.

**22.** 617 F.2d 1108 (5th Cir.1980). *See also, Sinclair Refining Co. v. Howell,* 222 F.2d 637, 639–40 (5th Cir.1955).

**23.** Fed.R.Civ.P. 7(a); *In re Zweibon,* 565 F.2d 742, 747 (D.C.Cir.1977).

**24.** Fed.R.Civ.P. 61.

**25.** *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

ry judgment. In the ensuing two months, Trotter did not present any evidence to show actual malice. Indeed, he canceled the depositions of the two reporters who researched and drafted the allegedly libelous articles.

Trotter justifies his failure to conduct the depositions on the ground that they were scheduled only two or three weeks before the date his response to Anderson's summary judgment motion was due, but he did not request additional time from the court for discovery. Moreover, at the summary judgment conference, Trotter told the court that he was taking the position that he did not have to show actual malice, contending that a showing of negligence was sufficient. Consequently, he indicated that he did not see any reason to spend time developing the actual-malice issue, and he stated that he would prefer to appeal the district court's holding that actual malice must be shown instead of trying to prove actual malice. On the record, then, the evidence does not support Trotter's argument that his failure to show actual malice resulted from the district court's denial of an opportunity for him to do so.

For these reasons, we AFFIRM.