KNOLL, Judge.
This appeal concerns an action for damages brought by Kenneth L. Broussard for defamatory comments which appeared in editorials published by Conrad Kaplan in his weekly newspaper, The Kaplan Herald. The trial court rejected Broussard’s claim, finding that Broussard was a limited purpose public figure and that Broussard failed to prove with clear and convincing evidence that Kaplan acted with actual malice.
Broussard appeals, contending that the trial court erred in finding that: (1) Brous-sard was a limited purpose public figure; (2) Broussard had the burden of proving that Kaplan acted with actual malice in publishing the defamatory statements; (3) *79 Kaplan’s evidence refuting Broussard’s assertions of falsity was more credible; and, (4) the evidence supported that Kaplan’s belief in his editorial opinions were, based in truth.
Broussard does not contest the findings of fact made by the trial court. Instead, he argues that the trial court improperly applied the law to the facts, and supplied facts regarding Kaplan’s belief that Brous-sard’s actions were improper.
The trial court provided the reviewing court with its findings of fact and thorough, well written reasons for judgment applying the law to the facts of the present case. After carefully reviewing the record, we affirm finding that the trial court applied the correct legal principles to the facts presented. We likewise conclude that the record supports the facts found by the trial court. Accordingly, we adopt the well written reasons for judgment as our own, and append them to this opinion.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Kenneth L. Brous-sard.
AFFIRMED.
APPENDIX
REASONS FOR JUDGMENT
Filed June 18, 1990.
Plaintiff, Kenneth L. Broussard, sued defendant, Kaplan Publishing Company and its owner, Conrad Kaplan, for alleged defamatory comments published in the defendant’s weekly newspaper, The Kaplan Herald. The trial was held from May 16 to 18, 1990, and upon receiving post-trial briefs, the matter was taken under advisement on June 4, 1990. The following parties were present at the trial:
Plaintiff, KENNETH L. BROUSSARD, represented by MR. RUELE BOURQUE; and
Defendants, CONRAD KAPLAN and the KAPLAN PUBLISHING COMPANY, represented by MR. MICHAEL HER-PIN.
After considering all the evidence and arguments of counsel, the Court makes the following findings of fact and conclusions of law:
The municipality of Kaplan is located in a predominately [sic] rural area of southwest Louisiana. The plaintiff, Kenneth Brous-sard, a long time resident of Kaplan, is an insurance agent who, over the years, has been active in numerous civic affairs including chairman of the Kaplan Civil Service Board and vice-chairman of the Kaplan Housing Authority. In 1966 and 1972, Broussard also made two (2) unsuccessful bids for the Kaplan City Council.
As an insurance agent Broussard represents several insurance companies but 80% of his sales are through New York Life, a company he has represented for over 27 years. From 1972 until 1986, Broussard was awarded the group health insurance contract for the City of Kaplan employees, providing coverage primarily through New York Life. In January, 1986, the City terminated the plaintiff’s contract and awarded the bid to Metropolitan Life, locally represented by Gwen Simon. According to the plaintiff, the City’s decision to terminate his contract and award it to Metropolitan was based on political animosity between he [sic] and the mayor of Kaplan, then Dalfares Trahan.
Trahan’s term of office ended on June 31, 1986, and the newly elected mayor, Elies Lormand, and several new city council members, dubbed “the Lormand ticket”, assumed office on July 1, 1986. Broussard actively supported the Lormand ticket. He testified that he composed announcements for two (2) of the Lormand candidates, at-tendedpolitical strategy meetings at the candidates’ homes and even brought a political consultant to one meeting to advise the candidates on how to conduct their campaigns. The candidates did not hire the political consultant because he was too expensive.
One week after the Lormand administration took office, on July 6, 1986, at the second City Council meeting of the new administration, Broussard appeared to present a price quote for group health insurance for the city employees. Broussard stated that the mayor and several city *80 council members asked for the quote because the city employees were dissatisfied with Metropolitan’s claims coverage. After Broussard presented his quote, Ms. Simon, who was also present at this meeting, told the council that Metropolitan had delayed paying claims because the City of Kaplan owed $48,000.00 in past due premiums. Metropolitan was willing to work out a long-term payment schedule with the City to resume coverage as soon as possible. The Council voted to remain with Metropolitan until December 31, 1986, the remainder of the policy period.
Coincidentally, around the time of the July 6, 1986, council meeting, an insurance group identified as “LMA” contacted Saundra Broussard, the City Clerk of Kaplan. LMA was interested in presenting an insurance proposal sometime in the future to the City of Kaplan and, in order to prepare the quote, wanted a three (3) year “loss report” on the city’s employees. Ms. Broussard learned the plaintiff had this information as he had been the former carrier’s agent from 1972 until January, 1986. After Ms. Broussard telephoned the plaintiff to get this information, he responded by asking “What do you mean? Weren’t you at the last council meeting? Don’t you understand what is going on?” At this point, Ms. Broussard told the plaintiff of LMA’s request for the three (3) year loss report and in response he stated “I don’t want anyone else bidding on that insurance.” He then invited her to his office “to explain”. She declined saying that she did not wish to get involved in politics at City Hall. The plaintiff did not contradict Ms. Broussard’s version of the alleged conversation.
On December 6, 1986, the City Council opened bids for the employees health insurance. Both the plaintiff and Ms. Simon represented numerous carriers and submitted written bids. The Council voted to let the finance committee consider the bids, then make a recommendation to the mayor who would make the final determination. The finance committee was composed of council members Pedro Jones, Dennery Hargrave, Kyle LeBlanc, and Clifford Landry. While the testimony conflicted as to the number of meetings the finance committee held, the committee had at least one unpromulgated meeting. At this meeting, the plaintiff and Ms. Simon presented their various policy proposals. The committee members “in” with the Lormand administration, Mr. Jones and Mr. Hargrave, consistently asked questions that were favorable to the plaintiff’s proposals and adverse to Ms. Simon’s proposals. Sometime soon after this meeting the committee voted to award the contract to one of the plaintiff’s companies, Washington National Life Insurance Company.
Conrad Kaplan is the editor, publisher and owner of The Kaplan Herald, a weekly newspaper circulated in Kaplan and the surrounding area. Kaplan also owns in partnership with Roy Vincent, the Riceland Insurance Agency. Vincent’s daughter is Gwen Simon, the plaintiff’s primary competitor for the City’s insurance contract. Simon’s insurance agency is not otherwise connected with the Riceland Insurance Agency.
Frustrated with what he perceived to be improprieties by the Lormand administration and certain City Council members, beginning in October, 1986, Kaplan started publishing a series of editorials charging that “a conspiracy of four” was running the Kaplan municipality. On January 14, 1987, Mr. Kaplan published the following editorial:
An Editorial....
While You Enjoyed the Holidays....
While everyone was enjoying the holidays, thinking about good will and looking forward to a New Year, the Conspiracy of Four was enjoying themselves also. Their latest planning has netted the employees insurance coverage for one of their own. Some of the planning went on at the home of the Mayor last week before “city manager” Dane Gui-dry informed others who bid for that insurance coverage it had been awarded to a company represented by Kenneth Broussard. We are sure that the fact that all of the “propaganda” in the Lor-mand campaign came out of that office *81 on First Street had nothing to do with awarding the coverage and the commission that goes with it to Broussard. Well, folks, that is politics, but you should be aware of several other things.
You ... well somebody did ... elected Ellis Lormand as Mayor of this city. He is not serving as Mayor ... this town is being run by the “conspiracy of four” and they are doing things their way. They have given out many jobs and those people are going to ‘hell and back’ for them because of those jobs. Anything progressive still going on in this City is something left over from the previous administration, the one that was so bad.. .remember!
The “gutless” group which takes their orders from the “4” are elected officials and therefore subject to being either recalled or tossed out in a future election. The question is, folks, if you wait until the next election this City will be too far gone to ever have it recover. Happy holidays folks ... certain folks got their Christmas gifts in time for the New Year.
The next week, on January 21, 1987, Kaplan followed with this:
An Editorial ...
THEY JUST KEEP DOING IT TO US
In an editorial last week, we pointed out that the “Conspiracy of Four”, the group leading our city government right now to a tremendous financial disaster, a miserable reputation and who knows what else, continue their clandestine (secret) meetings where their next moves are planned.
There is no doubt that a lot of their actions are illegal, but unless you can prove it or no one takes any action against them, they’ll just continue on their merry way. As we pointed out last week, they have supporters ... the people they hired and the folks who have benefited from their antics. Its the rest of the population of this city that is getting “screwed” and those are the ones we are concerned with.
They do little at regular meetings, but they do have one coming up on Tuesday. Go ahead and attend the meeting and then when certain members move into the room where their “city manager” has a private telephone line, after the meeting, just join in their festivities ...
Upon cross-examination, Kaplan testified that the plaintiff was one of the members of the “conspiracy of four”, and the other three (3) members were the City Manager, Dane Guidry, Councilman Pedro Jones and City Court Judge Ruele Bourque. However, the January 14, 1987 editorial which identified the plaintiff, Kenneth Broussard, as one of the four (4) was the only editorial which named any of the members of the alleged conspiracy. Kaplan testified that he purposefully chose the word “conspiracy” to draw the public’s attention to the secrecy of the meetings but he did not intend to imply that the four were acting illegally. Kaplan intended to criticize “the spoils system” he believed was in effect under the Lormand administration whereby those who had supported the Lormand candidates received jobs and political patronage such as the plaintiff being awarded the employees health insurance contract. The defendant stated that he knew that in a town the size of Kaplan, his editorials were “the talk of the town” and he knew that they would cause much controversy when he published them.
Kaplan based his editorial statements on information that was provided to him by various sources. He claimed that City Council member, Dallas Breaux, now deceased, a Lormand administration opponent, gave him financial information on the city’s budget which showed the disastrous financial condition of the City. Breaux also told Kaplan of the political patronage civil service jobs given to about twenty (20) Lormand supporters just after Lormand took office. Kaplan surmised that the selection process for the employees health insurance was improper because there was no public notice of the finance committee’s meeting and because there was no formal announcement of the contract’s award. Kaplan’s associate editor, Mrs. Amelia Lan-tier, testified that unlike here where the mayor chose the insurance contract after *82 the finance committee made a recommendation, generally public contracts were referred back to the city council for a vote after the finance committee made a selection. Kaplan learned that the plaintiff had been awarded the contract from his partner, Vincent, who was told by City Manager, Dane Guidry, that the plaintiff had received the contract and was already signing up employees. Saundra Broussard, the City Clerk, told Kaplan of her July, 1986, conversation with the plaintiff regarding the three (3) year loss report. The City’s accounting clerk, Joyce Carbough, also provided Kaplan with information on the City’s dire financial situation in the first six (6) months of the Lormand administration. Ms. Carbough testified that during the Lor-mand administration’s first weeks twenty (20) new employees were hired. Since there was not enough money in the payroll account to pay these new employees, the new administration took money from the utility account which caused the City to be delinquent in paying Gulf States Utilities, the area’s utility company. Within six (6) months of the Lormand administration taking office, the City had approximately $750,000.00 in delinquent bills. Ms. Car-bough called Kaplan personally with this information or gave it to Dallas Breaux to give to Kaplan. Disgruntled former employees who were either laid off or cut in salary also told Kaplan of the unprecedented hiring of new employees.
Kaplan assumed that the Lormand campaign literature was produced at the plaintiff’s office because the campaign literature’s type was similar to the type used by the plaintiff in his advertisements. Also, the campaign literature appeared to come from the direction of the plaintiff’s office, although Kaplan agreed that it could have come from another area. The defendant claimed that the fact that his partner’s daughter was the person who lost the insurance contract had no bearing on his editorials. Kaplan believed that the plaintiff’s political affiliation was the sole reason he was awarded the contract.
There was no evidence presented of the details of the plaintiff’s proposed insurance policies versus Ms. Simon’s insurance policies. The plaintiff testified that his proposal with Washington National saved the City $34,000.00 in premiums. However, Clifford Landry, a member of the finance committee testified that the premiums due under the plaintiff’s and Ms. Simon’s policies were the same, except that Metropolitan had “a reserve of $16,000.00” that the City would lose by changing companies.
In his petition the plaintiff asks for damages for mental suffering and humiliation, injury to reputation and loss of business. The plaintiff presented no evidence of mental suffering, humiliation, and injury to reputation. Gordon Herpin, a client and neighbor of the plaintiff, stated that he questioned the plaintiff’s reputation when the editorials were published but the plaintiff convinced him that he was not involved in any improprieties. Also, Herpin testified that the plaintiff has always enjoyed a high reputation in the Kaplan area and, as far as he knew, still does. He also knew of no one who had declined to purchase insurance from the plaintiff because of the editorials.
Mr. Robert Stelly, Jr., another agent with New York Life located in nearby Grand Coteau, testified that before 1986, he regularly saw the plaintiff’s name in New York Life’s sales achievement list. These lists are based on the volume of new sales generated within an applicable time period. Stelly had not seen the plaintiff’s name listed since 1986.
The plaintiff testified that since 1986 his annual income has declined from about $76,000.00 per year to about $50,000.00 per year but he failed to provide any written evidence of these amounts, such as his former income tax statements. Of his decreasing income, the plaintiff contends that five to ten percent was due to the down turn in the local economy, compared to Mr. Stelly’s estimate of ten to fifteen percent for this same down turn.
At the close of the plaintiff’s case, the defendant moved for a directed verdict, arguing that the plaintiff was either a “public figure” or that even if the plaintiff is a “private figure”, the topic commented *83 on was an event of “public or general concern”. Either finding required the plaintiff to prove with clear and convincing evidence that the defendant acted with “actual malice” as defined in New York Times v. Sullivan, 376 U.S. 264, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The defendant argued that the plaintiff had not presented sufficient evidence of actual malice.
Relying on the cases of Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) and Francis v. Lake Charles American Press, 262 La. 875, 265 So.2d 206 (1972), this Court ruled that the subject matter commented upon was clearly of public or general interest and hence, was subject to the “actual malice” standard. The Court denied the defendant’s motion for directed verdict because the plaintiff had presented a prima facie case of “actual malice”.
Post trial research on this issue compels the Court to revise this ruling. In Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court effectively overruled Rosenbloom v. Metromedia’s holding which required the “actual malice” standard to apply to alleged defamatory statements made regarding matters of public or general concern. Gertz again established that alleged defamatory falsehoods against a private figure are not constitutionally privileged simply because the falsehoods concerned a matter of public interest. The Court ruled that the “actual malice” standard applied only to “public officials” or “public figures”.
In defining “public figure” the courts have developed two (2) classes of public figures besides government officials. These include (1) general purpose public officials and (2) limited purpose public officials. In Trotter v. Jack Anderson Enterprises, Inc., 818 F.2d 431 (5th Cir.1987), the Court stated in pertinent part:
“General-purpose public figures are those individuals who “achieve such pervasive fame or notoriety that [they] become a public figure for all purposes and in all contexts.” Such persons have assumed so prominent a role in the affairs of society that they have become celebrities. “Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society,” an individual should not be characterized as a general-purpose public figure ...
Limited-purpose public figures achieve their status by “thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,” or because they “voluntarily inject [themselves] or [are] drawn into a particular public controversy.” ...
Whether an individual is a public figure is a matter of law for the Court to decide. This difficult determination cannot be made by the mechanical application of general rules. Indeed, defining a public figure has been likened to trying to nail a jellyfish to the wall. In an effort to give shape to what might be a formless injury into limited-purpose-public-figure status, the District of Columbia Circuit has developed a three-step test: (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiffs participation in the controversy. The test appears sensible and we adopt it.” (818 F.2d at 433-434) (Citations omitted).
Applying the foregoing three prong test to the facts of this case, the Court finds that the plaintiff was a limited purpose-public figure. The controversy commented upon involved the awarding of a public contract for city employees health insurance and both sides stated that before, during and after the editorials were published, the Lormand administration’s alleged mismanagement of the city was the “talk of the town”. The plaintiff was competing for and was ultimately awarded this contract and the defendant’s editorials concerned the plaintiff’s actions in obtaining this contract. As the plaintiff was a limit *84 ed-purpose-public figure, the actual malice standard must be used in determining the defendant’s liability.
This Court’s decision to reverse its original ruling that the matter was one of public concern and instead find that the plaintiff was a limited purpose-public figure does not affect the burden of proof of either party since the “actual malice” standard applies in both instances. Hence, under either ruling both parties’ burden of proof remained the same. Also, at the time of the Court’s ruling, the plaintiff would have presented all of his evidence regarding his status and of the defendant’s “actual malice” since the plaintiff had rested and the Court had made no prior rulings on the plaintiff’s public/private figure status.
As a public figure, in order for the plaintiff to maintain an action in defamation, he must prove defamatory words, publication, falsity, actual malice and resulting injury. The plaintiff bears the burden of proving the falsity of the statements and “actual malice” must be proven by clear and convincing evidence. Gertz v. Robert Welch, Inc., supra; Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). The defendant published editorials which accused the plaintiff of belonging to a secret conspiracy which illegally controlled and mismanaged the city’s finances and allowed the plaintiff to personally financially benefit from the process. Such allegations of criminal activity are considered defamatory per se.
Before considering the remaining elements the plaintiff had to prove, namely, falsity, actual malice and damages, the Court must first address the argument raised in the defendant’s post trial brief. Kaplan argues that the plaintiff’s claims must be dismissed because his statements are protected by the First Amendment as “fair comment,” defined as expressions of opinion rather than statements of fact.
In Mashburn v. Collin, 355 So.2d 879 (La.1977) the Louisiana Supreme Court established that the First Amendment protects expression of opinions about matters of public concern that were made without knowing or reckless falsity. Later, in Bussie v. Lowenthal, 535 So.2d 378 (La.1988), the Court clarified this by stating that a statement of pure opinion, based totally on the speaker’s subjective view which does not state or imply the existence of underlying facts, is afforded complete protection under the First Amendment. Opinions which state or infer that certain false facts are true will still be protected if the statements were made “without knowing or reckless falsity.”
Hence, in analyzing the defendant’s editorials, the Court must first determine whether these editorials were (1) pure opinion, or (2) opinions which stated or inferred facts. Should the Court find that the editorials stated or inferred facts, the Court must then determine (3) whether such facts were false and, if so, (4) whether the statements were made with “knowing and reckless falsity”. The third and fourth prongs are the same analysis that must be conducted in determining alleged defamation of a “public figure” under New York Times v. Sullivan, supra; i.e. whether the stated facts are false and made with “actual malice,” defined as knowledge that the statement was false or with reckless disregard of whether it was false or not.
In determining whether a statement is an opinion or one inferring facts, the Court in Mashburn set forth the following guidelines:
“Although difficult to state in abstract terms, as a practical matter, the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker’s or writer’s opinion, or as a statement of existing fact. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker did not intend to assert another objective fact but only his personal comment on the facts which he had stated. An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff’s conduct, qualifications *85 or character; or when both parties to the communication know the facts or assume their existence and the comment is clearly based on the known or assumed facts in order to justify the comment. Criticism is privileged as fair comment only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are common knowledge or readily accessible.
In determining whether an expression is a statement of fact or opinion under the common law, words must be read in their context. Words which, taken by themselves, would appear to be a positive allegation of act, may be shown by the context to be a mere expression of opinion or argumentative influence. On the other hand, if a statement, ostensibly in the form of an opinion, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication, the expression gives rise to the inference there are undisclosed facts that justify the opinion. In such a case the expression, although in the form of an opinion, in reality implies a statement of fact, which is not usually protected by the common law privilege. In order for a statement to be defended as fair comment it must be recognizable by the ordinary reasonable person as opinion and not as statement of fact.
In this instance, the defendant’s statements included his opinion, the facts on which he based his opinion and his opinion based on implied facts. The editorials alleged the following facts: the plaintiff was one of four (4) members of a conspiracy who, as a group, were controlling the City of Kaplan’s affairs and, in the process, were leading the municipality to the brink of financial ruin. The editorials explicitly stated that the four were acting illegally. Also, the defendant implied that the plaintiff was awarded the contract for the city’s employees health insurance because he was one of the conspirators in control of the selection and because he supported the Lor-mand campaign by printing the Lormand campaign literature.
Under the Mashburn and New York Times analysis, the facts (both stated and implied) on which the defendant based his opinions will be protected only if they are (1) true, privileged or otherwise known as common knowledge or readily accessible facts or (2) were not made with actual malice. Other than the First Amendment privilege which is being considered, the defendant has asserted no other privilege available to him nor did he show that the facts were common knowledge or readily accessible facts. As stated earlier the plaintiff bears the burden of proving the falsity of the defamatory comments; the defendant did not have to present evidence of the truth unless the plaintiff presented a prima facie case of, falsity. In addition, the plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice.
In light of the foregoing burdens of proof, the Court finds that the plaintiff has not proven by a preponderance of the evidence that the facts were false or with clear and convincing evidence that the defendant acted with actual malice. The plaintiff presented evidence that (1) he was closely aligned with and actively supported the Lormand ticket before the election; ■ (2) according to Dane Guidry and Pedro Jones, the plaintiff was not part of a conspiracy controlling the affairs of City Hall; (3) the plaintiff was awarded the employees’ health insurance contract based on open bidding where he presented the best policy for $34,000.00 less in premiums and not because he was a supporter of the Lor-mand administration.
The defendant rebutted the plaintiff’s evidence by showing that (1) according to the unrefuted testimony of Saundra Broussard, the plaintiff strongly implied that he was involved in a “behind the scenes” deal with the City Council in which it was clear that he intended to be awarded the contract without any competition and (2) according to finance committee member, Clifford Landry, the plaintiff’s insurance contract chosen by the Mayor cost the same as the Metropolitan policy, but in fact, provided less value for the money; (3) the manner *86 in which the contract was awarded was unusual since generally these contracts are voted on by the entire City Council and not awarded by the Mayor; (4) the questions presented to the plaintiff and Ms. Simon when making their presentations were all favorable to the plaintiff and all detrimental to Ms. Simon. Other than the evidence linking the plaintiff with a behind the scenes agreement to get the insurance contract, the defendant presented no evidence that the plaintiff was involved in any other activity which adversely affected the financial condition of the City.
The Court finds that the defendant’s evidence refuting the plaintiffs evidence of falsity was more credible than the plaintiffs. The plaintiffs evidence was primarily from either himself, which was too potentially self-serving or from other alleged “conspirators” who also filed suit against the defendant for these same editorials; thus, too likely biased. The defendant’s evidence was from sources who, while politically opposed to the Lormand administration, did not have an interest in testifying on behalf of the defendant.
Finally, the Court finds that the plaintiff did not prove with clear and convincing evidence that the defendant acted with “actual malice” defined as knowledge that the statement was false or with reckless disregard for whether it was false or not. After discussing numerous cases which addressed the reckless disregard aspect of this standard, the Court in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323 [20 L.Ed.2d 262] (1968) further stated:
“These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.” 390 U.S. at 731, 88 S.Ct. at 1325.
Later the Court stated:
“The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher’s allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. (Citations omitted) (390 U.S. at 732, 88 S.Ct. at 1326).
After the plaintiff’s case in chief, the plaintiff had presented sufficient evidence from which the Court believed that the defendant must have entertained serious doubts about the truth of his statements. One of the defendant’s sources for information on the financial condition of the City was Dallas Breaux, now deceased. As Breaux could not verify the defendant’s statements, the Court was cautious to accept the defendant’s allegations. However, during the defendant’s case, Joyce Car-baugh and Saundra Broussard stated that they also provided information on the City’s financial situation to the defendant. The Court found their testimony to be highly credible and reliable. Also, at the end of the plaintiff’s case, it appeared that the defendant presumed that the plaintiff was improperly awarded the insurance contract solely on information from his partner, Vincent, that Dane Guidry stated informally that the plaintiff received the contract and was already signing up employees. Initially, any statement by Vincent on this subject must be viewed as inherently biased because his daughter was competing with the plaintiff for this same contract. Also, this statement alone, without any other additional evidence of impropriety, was not sufficient evidence on which the defendant could have honestly believed the plaintiff was involved in a behind the scenes conspiracy. However, during the defendant’s case, Saundra Broussard testified that she *87 informed the defendant of the conversation which implicated the plaintiff in a secret deal to get the contract. This information, coupled with the unusual manner used to select the contract, the plaintiffs active support for the Lormand administration and the unobtrusive manner in which the award was announced lent support to the defendant’s assertions that he honestly believed to be true the facts on which he based his opinions. Hence, the Court finds that the plaintiff did not prove with clear and convincing evidence that the defendant acted with actual malice.
Based on the foregoing, the Court finds that the plaintiff has failed to carry his burden of proof of two (2) of the essential elements of his case; namely, that the plaintiff’s statements were false and that the defendant acted with actual malice. Since the plaintiff is not entitled to damages, a discussion of the plaintiff’s damages is moot. The Court finds in favor of the defendant.
Judgment will be signed upon presentation.
Thus Rendered and Signed in Chambers, at Crowley, Louisiana, this 15th day of June, 1990.
/s/ Don Aaron, Jr. District Judge