**WFAA–TV, INC., Appellant,**

v.

**John McLEMORE, Appellee.**

No. 10–96–033–CV

Court of Appeals of Texas,
Waco.

June 25, 1998.

Ordered Published Nov. 12, 1998.

R. Matt Dawson, Dawson, Sodd, Moe, Jacobson & Beard, P.C., Corsicana, James E. Wren, Haley & Davis, P.C., Waco, Paul C. Watler, Jenkins & Gilcrist, P.C., Dallas, for appellant.

Felipe Reyna, Reyna, Hinds & Crandall, John A. Montez & Aubrey R. Williams, Cherry, Davis, Harrison, Montez, Williams & Baird, P.C., Waco, for appellee.

Before Chief Justice DAVIS, Justice CUMMINGS, and Justice VANCE.

## OPINION

REX D. DAVIS, Chief Justice.

This is a defamation suit arising out of the 1993 raid by agents of the Bureau of Alcohol, Tobacco and Firearms (ATF) on the Branch Davidian compound at Mount Carmel outside of Waco. John McLemore, a reporter for KWTX–TV Channel 10 in Waco, sued (1) WFAA–TV Channel 8 in Dallas, (2) Valeri Williams, a WFAA reporter, (3) A.H. Belo Corporation, (4) Belo Productions, Inc., (5) the *Houston Chronicle,* and (6) Kathy Fair, a *Chronicle* reporter, alleging that their news reports regarding his role in the events surrounding the raid damaged his reputation in the community. After McLemore non-suited Williams and both Belo corporations, the trial court granted summary judgment in favor of the *Chronicle* and Fair but denied WFAA's motion. WFAA appeals claiming that the court erred when it rejected its motion. We will affirm.

## BACKGROUND

*FACTS*

On February 28, 1993, ATF agents sought to search the Mount Carmel compound occupied by the Branch Davidians, a small religious group. Through information gained from various sources, two local media outlets, KWTX–TV and the *Waco Tribune–Herald,* suspected that a major law enforcement operation was to occur at Mount Carmel that morning. KWTX dispatched McLemore and Dan Mullony, a cameraman, in one truck and John Peeler, another cameraman, in a second truck to report on the raid. The *Tribune–Herald* sent three vehicles containing seven reporters to Mount Carmel to cover the events.

When the ATF agents attempted to enter the building, they became involved in a gunfight with the Davidians. Four ATF agents and three Davidians were killed, and twenty ATF agents were wounded during the shooting. McLemore and Mullony had followed the ATF agents onto the compound grounds and were the only media representatives actually in the midst of the firefight. Mullony filmed the events and McLemore reported live from the scene of the gun battle.

On March 2, Kathy Fair appeared on Nightline, a late night news show anchored by Ted Koppel and broadcast nationally by ABC. During the show, Koppel and Fair discussed the media's role in the failure of the ATF raid:

KOPPEL: It's also fair to say that there are times when law enforcement loves [media attention], loves having those cameras there, loves having reporters along. What happened this time? Were we pushing too hard? Did they want the publicity? Is it too early to tell yet what went wrong?

FAIR: Well, I think it's too early to tell what went wrong inside the compound, and it may be too early to answer the question just what role the media may have played in the tragedy, whether the media bears any responsibility for the deaths of anyone. That's a question that has been asked at every press conference I've attended. It's a question that's been asked at every impromptu gathering between reporters and news sources in there. And the question has always been answered the same officially, and that is that they're not going to answer that question right now. But unofficially, and off the record, I think many officers will tell you that they blame the media, particularly the local media, for the tragedy that occurred here. They think the fact that both the newspaper and the local television station, who were already at the compound, some of whom were reporters for, I believe, the TV station, allegedly were already hiding in the trees when federal agents arrived. And that was the first indication that many of them had that they had been set up, and that's a strong belief I think they have that they have not shared publicly yet, is that they think they were set up.

KOPPEL: Set up by whom?

FAIR: My sources have told me they think they were set up by at least one reporter and perhaps one local law enforcement official.

KOPPEL: Now, when they say "set up," Kathy, what do they mean by set up in this instance?

FAIR: That they were aware of the raid that had been planned by the federal agents, and that they had tipped off the sect about it, and that that is how they got permission to be on the grounds before the federal agents arrived.

As soon as the Nightline broadcast concluded, KWTX began to receive calls critical of McLemore's role in the raid. Even though Fair did not identify him by name, many callers immediately believed that she was referring to him and that he was responsible for the disastrous results of the ATF raid. WFAA picked up the story and broadcast reports by Williams the next day during both its 6:00 p.m. and 10:00 p.m. news shows. At 6:00, the station showed the following report: [1]

[ANCHORS]: (Glor) As the standoff moves into its fourth day, one very troubling scenario is brought up again and again. ATF officials resolutely say the agents in Sunday's raid were set up. (John) What is alleged is that an hour before the raid, someone called the cult compound. The question is who was that person? And perhaps more troubling, could it have been a reporter from the Waco media. Or are federal officials trying to shift the blame for what some call a poorly planned operation. Channel 8's Valeri Williams has more.

[Video: Excerpt from a news conference by representatives of the ATF and the FBI was played showing the following exchange:

Reporter: Do you know who the phone call was from?

ATF spokesman: No, we don't.

Reporter: There has been a report that this may have come from the media. Do you suspect it was a media tipoff?

ATF spokesman: We don't have any information on that.]

[WILLIAMS]: At a morning news conference in Waco federal officials were unwill-

---

1. WFAA attached transcripts of Williams' reports shown on its 6:00 and 10:00 news shows. We have reproduced those transcripts with some punctuation and capitalization changes. We have also bracketed in the significant video portions of the reports.

ing to place any public blame. But what has these journalists concerned is this Nightline interview with Houston Chronicle reporter Kathy Fair.

[Video: Excerpt from the portion of Nightline quoted above, where Koppel asks Fair "what do they mean by set up" and Fair replies "That they were aware of the raid that had been planned by the federal agents, and that they had tipped off the sect about it, . . ."]

[WILLIAMS]: Fair goes on to say that her ATF sources saw reporters hiding in trees at the compound before the attack was to begin.

[Video: Footage of McLemore, apparently on the compound grounds, saying "and then the next thing you know.. there's bullets coming out of the house. . . ."]

[WILLIAMS]: The only reporters at the scene Sunday morning were Steve [sic] McLemore and a television photographer from KWTX–TV in Waco and one or two reporters from the local newspaper. McLemore's news unit was used to transport some of the wounded agents. Currently his bosses are consulting with attorneys before issuing a statement. But the editor-in-chief of the Waco Tribune Herald issued this statement: "I do not know what local reporter that was being referred to, but it sounds absolutely ridiculous to me. Our reporters would not do such a thing."

[Video: Excerpt from a Cable Network News broadcast, in which David Koresh, the leader of the Branch Davidians, states "I knew they were coming. I knew they were coming before they knew they were coming."]

[WILLIAMS]: Another scenario is that perhaps one of ATF's own informants accidentally tipped David Koresh off. Federal authorities acknowledge that they had infiltrated the cult. And that shortly before the ill-fated raid began their own man slipped out. Koresh says the agent's name was Richard Robert Gonzales.

[Video: Second excerpt from CNN, in which Koresh states "So what happened was Robert came in and sat down course I look him in the eyes and I say, 'Robert, you know I

love you and I've shown you truth. It's right here out of your Bible. Now you have to deal with what I showed you.' "]

[WILLIAMS]: Now perhaps all of the warning signs were there that this raid was a set up. If it's true that reporters were spotted hanging from trees why didn't authorities stop the raid before agents ever went through the front door? On the other hand, if reporters covertly tipped the cult off to gain a story not only have they broken every journalistic ethic but they could be found guilty of obstruction of justice.

Valeri Williams, Channel 8 News.

At 10:00 p.m., WFAA broadcast a similar piece:

[ANCHOR]: ATF officials have insisted the raid went awry because they lost the element of surprise. They say the cult was tipped off by a phone call one hour before their strike. The question has been who would have made that call? Last night on ABC's Nightline accusations were made against the local media in Waco. More on the story from Channel 8's Valeri Williams.

[Video: Excerpt from the Nightline broadcast featuring Fair's statement "My sources have told me they think they were set up by at least one reporter and perhaps one local law enforcement official."]

[WILLIAMS]: It is this interview with Houston Chronicle reporter Kathy Fair that has stirred a storm of controversy. Fair told Nightline's Ted Koppel when ATF sources arrived at the compound they saw Waco television reporters "hiding in the trees". Fair then makes this revelation:

[Video: Second Nightline excerpt showing Fair stating "they were aware of the raid that had been planned by the federal agents, and that they had tipped off the sect about it, and that that is how they got permission to be on the grounds before the federal agents arrived." Apparently, a video showing McLemore at the scene of the gunfight played during Williams' comments that follow.]

[WILLIAMS]: Now the only reporters at the scene Sunday morning were John McLemore and a photographer from KWTX–TV in Waco along with one or two reporters from the local newspaper. McLemore's news unit was used to transport some of the wounded agents. Wednesday night McLemore's station is demanded [sic] a retraction from Nightline saying, "the rumor that a Waco reporter had tipped the cult about the raid in exchange for permission to be on the compound grounds was completely false. No reporter or photographer from local media was on the compound grounds prior to the raid." The Waco Tribune Herald has also called the charges "ridiculous." Nightline's answer: "We are looking at the charges with our legal department and have no response tonight."

[Video: Footage from the press conference held by federal authorities in which a reporter asks "There has been a report that this may have come from the media. Do you suspect it was a media tipoff?"]

[WILLIAMS]: Despite repeated questions at their news conference federal officials were unwilling to place any public blame. Now perhaps all of the warning signs were there that this raid was a set up. If it's true that reporters were spotted hanging from trees why didn't authorities stop the raid before agents ever went through the front door? On the other hand, if reporters covertly tipped the cult off to gain a story not only have they broken every journalistic ethic but they could be found guilty of obstruction of justice.

Valeri Williams, Channel 8 News.

*MOTIONS FOR SUMMARY JUDGMENT*

Fair and the *Chronicle* sought a summary judgment on five grounds: (1) the statements were substantially true; (2) Fair's statements were not "of and concerning" McLemore; (3) her statements were privileged; (4) lack of actual malice on Fair's part; and (5) the "false light" claim was not actionable under Texas law. WFAA also moved for a summary judgment, raising six grounds: (1) no defamatory meaning; (2) fair report privilege; (3) fair comment privilege; (4) truth;

(5) no actual malice; and (6) neutral reporting privilege. WFAA supported its motion with Williams' affidavit, transcripts from the March 2 Nightline show, transcripts of Williams' reports from its March 3 6:00 p.m. and 10:00 p.m. news shows, affidavits from three law enforcement personnel, and excerpts from McLemore's deposition. The court granted the *Chronicle* and Fair a take-nothing summary judgment, but denied WFAA's motion.

*THE APPEAL*

WFAA appeals under the provisions of the Civil Practice and Remedies Code allowing for an appeal from the denial of a motion for summary judgment when the motion is based on a defense by a member of the electronic media arising under the First Amendment. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(6) (Vernon 1987). It reduces the six grounds raised in the trial court to four: (1) no defamatory meaning; (2) truth; (3) no actual malice; and (4) the statements were privileged.

## CONTROLLING LAW

*STANDARD OF REVIEW*

We apply the same standard of review to the court's denial of WFAA's motion for a summary judgment as we would if the court had granted the motion. *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 247 (Tex.App.—San Antonio 1996, no writ); *Holder v. Porter,* 845 S.W.2d 442, 444 (Tex. App.—Waco 1993, no writ); *see also Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *Freedom Communications, Inc. v. Brand,* 907 S.W.2d 614, 617–18 (Tex.App.—Corpus Christi 1995, no writ). Thus, WFAA must show there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985); *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). We must accept as true all evidence favoring McLemore, indulging every reasonable inference which favors him and resolving any doubts in his favor. *Nixon,* 690 S.W.2d at 548–49. To prevail, WFAA, as the defendant, must disprove at least one essential

element of each of McLemore's pleaded causes of action or otherwise show he cannot succeed on any of his asserted theories. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 476–77 (Tex.1995). If WFAA establishes its right to judgment as a matter of law, the burden shifts to McLemore to raise a fact issue precluding summary judgment. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995); *Casso,* 776 S.W.2d at 556. However, our review is limited to those issues expressly presented to the trial court by WFAA as a ground for granting the summary judgment and reasserted before this court. *McConnell v. Southside School Dist.,* 858 S.W.2d 337, 339 (Tex.1993).

*DEFAMATION*

■ A cause of action for defamation is made out when the plaintiff shows that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with, depending on the status of the plaintiff, either actual malice or negligence regarding the truth of the statement. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989); *Einhorn v. LaChance,* 823 S.W.2d 405, 413 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). A statement is defamatory if it tends to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *Free v. American Home Assur. Co.,* 902 S.W.2d 51, 54 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Einhorn,* 823 S.W.2d at 410–11.

PRIVATE PERSON v. PUBLIC FIGURE

■ Where the plaintiff is a public official or public figure, the First Amendment requires that the plaintiff show the defendant acted with actual malice before liability may be imposed. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967); *New York Times Company v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). If, on the other hand, the plaintiff is a private person, liability for actual damages may be constitutionally imposed when the plaintiff shows some lower level of fault. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). In

Texas, a private person may recover actual damages from a publisher or broadcaster on a showing that the defendant knew or should have known that the defamatory statement was false, *i.e.,* a showing that the defendant was negligent with regard to the falsity of the statement. *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex.1976).

■ Thus, the first step in our analysis is to determine McLemore's status. WFAA has alleged that McLemore is a public figure, and McLemore has not contested that label. However, because this is a summary judgment proceeding, WFAA must sustain the burden of conclusively establishing McLemore's status, and his failure to contest the label cannot suffice. *See McConnell,* 858 S.W.2d at 343; *Guinn v. Texas Newspapers, Inc.,* 738 S.W.2d 303, 304–05 (Tex.App.— Houston [14th Dist.] 1987, writ denied).

■ Public figures, for defamation purposes, come in two categories. The first type, a general purpose public figure, is an individual who has "achieve[d] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013. The second type, a limited-purpose public figure, is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* Such a person has "thrust himself into the vortex of [a] public issue, [or has] engage[d] the public's attention in an attempt to influence its outcome." *Id.,* 418 U.S. at 352, 94 S.Ct. at 3013. One court has observed that "[d]efining public figures is much like trying to nail a jellyfish to the wall," a sentiment that has been echoed several times since. *Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440, 443 (S.D.Ga.1976), *aff'd,* 580 F.2d 859 (5th Cir.1978); *see, e.g., Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433 (5th Cir. 1987); *Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.1987) (en banc); *Chevalier v. Animal Rehabilitation Center, Inc.,* 839 F.Supp. 1224, 1234 (N.D.Tex.1993).

■ However, the Fifth Circuit has adopted a three-step test for determining whether a person is a limited-purpose public

figure. *Trotter,* 818 F.2d at 433–34 (citing *Tavoulareas,* 817 F.2d at 772–73). At least one Texas Court of Appeals has incorporated the test into Texas law. *Einhorn,* 823 S.W.2d at 413. To find that the plaintiff is a limited-purpose public figure, the Fifth Circuit suggests that we must affirmatively answer each of these elements:

(1) The controversy at issue was public both in the sense that people were discussing it and people other than the immediate participants in the controversy were likely to feel the impact of its resolution;

(2) the plaintiff had more than a trivial or tangential role in the controversy; and

(3) the alleged defamation was germane to the plaintiff's participation in the controversy.

*Id.; Trotter,* 818 F.2d at 433–34.[2] We will also apply this test, bearing in mind, however, that the determination cannot be made by the mechanical application of general rules. *Trotter,* 818 F.2d at 433.

### THE CONTROVERSY

 The Branch Davidian raid is clearly a public controversy within both of the considerations involved in the first element. But was this the controversy that applied to McLemore? We think not. The defamatory nature of the present case arises from the controversy surrounding the ethics of McLemore's journalistic standards as applied to his alleged activities. Even though McLemore's employment has as its subject a constant stream of newsworthy events, his journalistic standards are at issue—affecting him as a private person in his profession.

McLemore's employer assigned him to cover the Branch Davidian raid as it could have assigned any of its other reporters. Nothing in the present record establishes that he voluntarily injected himself or that he attempted to influence the outcome of that raid. *Gertz,* 418 U.S. at 351–52, 94 S.Ct. at 3013; *Foster,* 541 S.W.2d at 816–17.

The controversy at issue was not a public one because it involved McLemore's personal ethical standards as a journalist. *See Trot-*

*ter,* 818 F.2d at 433. Thus, the manner in which McLemore reported on the ATF raid was not a public issue into which he "thrust himself." *Gertz,* 418 U.S. at 351–52, 94 S.Ct. at 3013.. Because WFAA's report on McLemore's ethics did not address a matter of public concern, McLemore retained his status as a private individual.

### CONCLUSION

As a private individual, McLemore's standard of proof is negligence as to WFAA. Because WFAA has not asserted a right to summary judgment on that standard, the issue is not before us. *McConnell,* 858 S.W.2d at 343; *Guinn,* 738 S.W.2d at 306. We affirm the trial court's denial of the Motion for Summary Judgment by WFAA–TV, Inc. We remand this cause to the trial court for further proceedings consistent with this opinion.

---

**2.** Neither the United States Supreme Court nor     the Texas Supreme Court has adopted this test.